IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| DOUBLETAP DEFENSE, LLC,<br><br>　　　　　　　Plaintiff,<br><br>　vs.<br><br>HORNADY MANUFACTURING CO.,<br><br>　　　　　　　Defendant. | **8:18CV492**<br><br><br>**MEMORANDUM & ORDER** |

This matter is before the Court on Plaintiff Doubletap Defense, LLC's ("DTD") Motion to Exclude Expert Testimony (Filing No. 92) and Motion for Partial Summary Judgment (Filing No. 94). Also before the Court are Defendant Hornady Manufacturing Co.'s ("Hornady") Motion to Exclude (Filing No. 93), Motion to Strike Plaintiff's Supplemental Report (Filing No. 95), Motion to Exclude Expert Testimony (Filing No. 96), and Motion for Summary Judgment (Filing No. 97). For the reasons stated below, DTD's Motions to Exclude and Hornady's Motion to Exclude and Motion for Summary Judgment are denied. DTD's Motion for Partial Summary Judgment is granted in part and Hornady's Motion to Strike is granted, as consistent with this Memorandum and Order.

**FACTS**

Hornady is a Nebraska corporation with its principal place of busines is in Grand Island, Nebraska. Filing Nos. 45 at 2, 46 at 1. DTD is a limited liability company organized under the laws of Georgia and its only member is a citizen of Missouri. Filing Nos. 45 at 2, 46 at 1.

## DTD and the "Pocket Pistol"

DTD was formed in 2010 or 2011 by Marvin Dufner and Ray Kohout.  Filing No. 98-1 at 3.  DTD produced a small, lightweight, two-barrel, concealable firearm that would fire single shots out of each barrel through successive "double tap" trigger pulls.  The firearm was known as the "Pocket Pistol."  Filing Nos. 98-15 at 1, 8 and 98-1 at 6.  Kohout patented his idea for the trigger mechanism and assigned the patent to DTD.  Filing No. 98-15 at 1.  As a result of an unrelated settlement agreement, another individual was added as a co-inventor to the utility patent.  Filing No. 98-2 at 23.  DTD partnered with Azimuth Technologies ("Azimuth") to produce the Pocket Pistol.  Filing No. 98-1 at 7-8.  Azimuth manufactured approximately 23,000 Pocket Pistols with an aluminum frame.  Filing No. 98-1 at 11, 10.  DTD purchased the Pocket Pistols from Azimuth at approximately $170 per unit.  Filing No. 98-1 at 8.

DTD started shipping Pocket Pistols for retail sale in or about late May and early June of 2013.  Filing No. 98-2 at 8.  By mid-June of 2013, DTD received customer complaints of "double strikes."  Filing No. 98-2 at 8.  Double strikes occur when both of the pistol's barrels fire simultaneously.  Filing No. 98-1 at 10.

In April 2014, after slowing sales on the initial run of 25,000 guns, DTD looked to replace the first-generation Pocket Pistol with a second-generation firearm (the "Gen 2" firearm).  Filing Nos. 98-2 at 20 and 98-1 at 14.  In preparation for the "Gen 2" firearm, DTD and Azimuth entered into an agreement with Bill Hicks & Co. ("Bill Hicks") to sell 6,000 first-generation Pocket Pistols as a closeout sale.  Filing No. 98-2 at 21.  Bill Hicks paid $200 per pistol, with Azimuth receiving $50 a pistol plus $5 in consideration of excise tax.  Filing No. 98-2 at 21.  These closeout price points were significantly lower than the

price DTD had previously charged to wholesalers.  Filing No. 98-2 at 21.  Azimuth's remaining inventory of first-generation firearms were sold to Chattanooga Shooter Supply, Inc.  Filing No. 98-1 at 14.  DTD asserts that it had approximately 7,000 orders for a titanium version of the Pocket Pistol.  Filing No. 98-2 at 25.  The titanium version was never produced.  Filing No. 98-2 at 25.

DTD's sales revenue, gross profit and net income from the launch of the Pocket Pistol until April 2014 were as follows:[1]

| Month | Sales Revenue | Gross Profit | Net Income |
|---|---|---|---|
| May 2013 | $130,317 | $54,311 | $(23,950) |
| June 2013 | $736,004 | $322,355 | $245,718 |
| July 2013 | $1,493,327 | $689,957 | $605,444 |
| August 2013 | $1,481,248 | $482,862 | $473,350 |
| September 2013 | $1,118,994 | $40,173 | $336,580 |
| October 2013 | $81,771 | $40,173 | $(85,482) |
| November 2013 | $90,662 | $22,605 | $(139,130) |
| December 2013 | $119,307 | $49,394 | $(17,431) |
| January 2014 | $26,849 | $1,850 | $(174,999) |
| February 2014 | $20,370 | $(14,701) | $(93,541) |
| March 2014 | $60,767 | $16,385 | $(41,890) |
| April 2014 | $6,880 | $8,860 | $(72,578) |

DTD wanted the Gen 2 pistol to come in different materials: polymer, aluminum, and titanium.  Filing Nos. 98-1 at 12-13 and 98-2 at 6.  DTD had conversations with Nordon Plastics about producing a polymer frame for approximately $10 per frame.  Filing Nos. 98-1 at 15 and 98-2 at 11, 22.  No manufacturing agreement was signed between Nordon Plastics and DTD.  Filing No. 98-1 at 15.  DTD was also working with Bob Domain, an engineer at Fabrique National Manufacturing, Inc., to resize and reconfigure the trigger

---

[1] The tables are taken from Filing No. 97-1 at 5 and 6, based upon DTD's QuickBooks Data, compiled by Hornady's Expert Kenedy in Filing No. 98-11 at 12, 14.  DTD did not controvert the table's information in their response, so the figures are deemed admitted for the purpose of this motion under Local Rule 56.1(b)(1).

mechanism to fit with the polymer frame.  Filing No. 98-2 at 11-12.  Domain also did engineering work for the California safety device on the Gen 2 pistol, which was required in order to sell the firearm in California.  Filing No. 98-2 at 12.  Despite these efforts, DTD did not have a working prototype, a written cost estimate, or a written business plan for the Gen 2 firearm.  Filing Nos. 98-1 at 15-17 and 98-2 at 6, 12, 16, 18-19, 22-23, 24.

### DTD and Hornady's Trademark Agreement

In March 2013, DTD and Hornady entered into a Trademark Assignment and License Agreement ("the Agreement").  Filing No. 45-1.  The Agreement resulted from the settlement of a trademark infringement lawsuit.  Filing No. 45-1 at 2-3.  In the Agreement, DTD assigned all of its rights, title, and interest in and to its "DOUBLETAP Marks" ("the Marks") to Hornady, and for a royalty fee and other consideration, Hornady licensed the Marks back to DTD.  Filing No. 45-1 at 3-5.  The Agreement contained a choice of law provision, stating that the Agreement was governed by and construed according to the law of Nebraska.  Filing No. 45-1 at 8.

The Agreement also contained an indemnification clause which stated:

SECTION 7.  INDEMNIFICATION.  EACH PARTY SHALL INDEMNIFY, DEFEND, PROTECT, AND HOLD HARMLESS THE OTHER PARTY AND ITS OFFICERS, DIRECTORS, OWNERS, MEMBERS AND EMPLOYEES FROM AND AGAINST ALL CLAIMS, DEMANDS, LAWSUITS, DAMAGES, LIABILITIES, JUDGMENTS, COSTS, AND EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES) ARISING FROM OR RELATING TO A PARTY'S BREACH OF THIS AGREEMENT; OPERATION OF ITS BUSINESS, ITS DESIGN, MANUFACTURE, SALE OR DISTRIBUTION OF ANY PRODUCT AND/OR SERVICES, THE ACT OF ANY EMPLOYEE, AGENT, OR PRINCIPAL CONNECTED WITH ITS BUSINESS, ITS OBLIGATIONS UNDER THIS AGREEMENT; ANY LIABILITY RESULTING FROM THE USE OR MISUSE OF ANY PRODUCT AND/OR SERVICES BY ANY END USER OF SUCH PRODUCT AND/OR SERVICES; OR, WITH RESPECT TO LICENSEE, LIABILITY RELATED TO TRADEMARK INFRINGEMENT CLAIMS FOR ITS USE OF THE MARKS AS CONTEMPLATED BY THIS AGREEMENT.  THE INDEMNIFIED PARTY

4

SHALL RETAIN THE RIGHT TO SELECT ITS COUNSEL IN THE EVENT THE INDEMNIFIED PARTY IS THREATENED WITH OR JOINED IN ANY ACTION ARISING FROM THE INDEMNIFYING PARTY'S ACTIONS OR INACTION.

Filing No. 45-1 at 5-6.

DTD received a cease-and-desist letter dated June 9, 2014, from Double Tap Ammunition ("DTA") demanding DTD cease using the DoubleTap mark—the mark Hornady licensed to DTD. Filing No. 45. DTD tendered the cease-and-desist letter to Hornady and demanded that Hornady honor the indemnification provision in the Agreement. Filing No. 45. Hornady refused to indemnify DTD. DTD alleges it was forced to cease conducting business after Hornady declined to indemnify it from a trademark infringement claim involving the DTD mark.

### Background on Expert Testimony of Damages

DTD filed the initial complaint, alleging breach of the Agreement, Filing No. 1, on June 7, 2018, in the United States District Court for the Northern District of Georgia. On October 17, 2018, the case was transferred to the United States District Court for the District of Nebraska. Filing No. 20. This Court granted a Motion for Leave to Amend Complaint on February 11, 2019. Filing No. 44. DTD filed the Amended Complaint alleging breach of contract on February 15, 2019. Filing No. 45.

DTD alleges that its damages for Hornady's breach are equal to the fair value of a 100% equity interest in DTD's business. *See* Filing No. 98-10 at 19. DTD's initial report (the "Initial Report") by Howard Zandman, CPA, opined that DTD's value as of June 9, 2014—the date on the cease-and-desist letter—was $4,072,000. Filing No. 98-10 at 5, 19. The valuation was based on DTD's 2013 monthly financials. Filing No. 98-5, 90:24-25. In creating the Initial Report, Zandman stated, "We [Aprio] have conducted interviews

5

with the current management of the Company and/or their representatives concerning the past, present, and prospective operating results of the Company." Filing No. 98-10 at 48. Zandman's partner at Aprio, Carrie Zhou, helped write the Initial Report.

Hornady's expert, William Kenedy, noted discrepancies in DTD's Initial Report in his rebuttal report (the "Kenedy Report"). Filing No. 98-11. Kenedy attacked Zandman's assumption that DTD would continue to sell the original version of the Pocket Pistol into the future. Zandman's Initial Report assumed that DTD was "finalizing" an agreement with Azimuth Technologies to manufacture the Pocket Pistol as of the June 9, 2014, valuation date. However, Kenedy noted that discovery documents showed DTD and Azimuth terminated their contractual obligations approximately one month prior to the valuation date. Additionally, the Kenedy Report noted that prior to the valuation date, DTD's management liquidated all its Pocket Pistol inventory at an approximately fifty percent mark down in May 2014 and that DTD had no intention of engaging in further sales of the original Pocket Pistol. In sum, Kenedy pointed out that Zandman and Zhou had originally placed that value of DTD at $4,072,000, based solely on projected sales of the original Pocket Pistol even though DTD had no intention to continue to sell the original Pocket Pistol. Using an asset-based approach to valuation, Kenedy determined the value of DTD on the valuation date was $0. Filing No. 98-11 at 7-8.

In response to the Kenedy Report, Zandman admitted that since the Initial Report dated June 20, 2019, he learned about DTD's intent to engineer and manufacture new guns with either polymer, titanium or aluminum. *See* Filing No. 98-12 at 11. He opined that had the cease-and-desist letter not been issued, DTD would have been able to continue the sales trend that it had in 2013 and would have launched new products that

would have boosted revenues into the future.  *Id.*  Zandman also suggested that the Gen 2 Pocket Pistol could be substituted for the original Pocket Pistol in his calculations so the valuation could potentially be the same with either firearm.  *See* Filing No. 98-12 at 10-11.  However, he reserved "the right to amend or supplement [his] report and/or findings, based on the new information I have learned since [issuing his initial report]."  *Id.*  Zhou later opined in a deposition that the valuation could not merely swap out the Gen 2 Pocket Pistol to reach the same valuation number and stated she would need to submit a supplemental report.  Filing No. 98-5 at 117:9-25.

The original deadline for both parties to provide complete expert disclosures was September 27, 2019.  Filing No. 50 ¶ 8.  Expert disclosure deadlines were extended several times by agreement of the parties.  *See* Filing Nos. 65, 70, and 76.  The final deadline for Plaintiff's initial disclosures was April 28, 2020, Filing No. 70, the final deadline for Defendant's expert disclosures was July 31, 2020, Filing No. 76, and the final deadline for Defendant's rebuttal expert disclosures was August 14, 2020, Filing No. 76 ¶ 1.  The final deadline for fact depositions was July 24, 2020, Filing No. 76, and the final deadline for expert depositions was September 18, 2020, Filing No. 78.

October 14, 2020, DTD submitted a supplemental report (the "Supplemental Report"), completed by Carrie Zhou, who had assisted in the creation of the original report.  Filing No. 98-14 at 3-4.  Zhou completed the Supplemental Report because Zandman had retired.  *See* Filing No. 98-14 at 4.  The Supplemental Report reflected Zhou's "understanding that Management liquidated the remaining inventory of first-generation aluminum guns by May 2014 in order to get ready for introduction of Gen 2 guns to the market at the January 2015 SHOT Show."  Filing No. 98-14 at 15.  Based on

7

new calculations, Zhou estimated DTD's worth on June 9, 2014, as $15,600,000. Filing No. 98-14 at 5. The valuation included subtotals of $6,700,000 for the aluminum gun business, $9,000,000 for the polymer and titanium gun business, and approximately $111,000 of debt. Filing No. 98-14 at 12.

## DISCUSSION

### I.    Evidentiary Motions

#### A.  Law

The Court first addresses the parties' evidentiary motions, all of which are directed at expert testimony related to DTD's alleged damages. Federal Rule of Evidence 702 governs the admissibility of expert testimony and requires that:  "(1) the evidence must be based on scientific, technical or other specialized knowledge that is useful to the finder of fact in deciding the ultimate issue of fact; (2) the witness must have sufficient expertise to assist the trier of fact; and (3) the evidence must be reliable or trustworthy." *Kudabeck v. Kroger Co.*, 338 F.3d 856, 859 (8th Cir. 2003). When faced with a proffer of expert testimony, trial judges are charged with the "gatekeeping" responsibility of ensuring that all expert evidence admitted is both relevant and reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999); *Daubert*, 509 U.S. at 589. The proponent of expert testimony bears the burden of providing admissibility by a preponderance of the evidence. *Lauzon v. Senco Prods.*, 270 F.3d 681, 686 (8th Cir. 2001).

Testimony is relevant if it is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591. Expert testimony assists the trier of fact when it provides information beyond the common knowledge of the trier of fact. *Kudabeck*, 338 F.3d at 860. To satisfy the reliability requirement, the party

offering the expert testimony must show by a preponderance of the evidence "that the methodology underlying [the expert's] conclusions is scientifically valid." *Barrett v. Rhodia, Inc.*, 606 F.3d 975, 980 (8th Cir. 2010) (citations omitted). There is no single requirement for admissibility as long as the proffer indicates that the expert's testimony and evidence is reliable and relevant. *Klingenberg v. Vulcan Ladder USA, LLC*, 936 F.3d 824, 829 (8th Cir. 2018).

"When the *application* of a scientific methodology is challenged as unreliable under *Daubert* and the methodology itself is sufficiently reliable, outright exclusion of the evidence is warranted only if the methodology 'was so altered by a deficient application as to skew the methodology itself.'" *United States v. Gipson*, 383 F.3d 689, 697 (8th Cir. 2004) (emphasis in original) (quoting *United States v. Martinez*, 3 F.3d 1191, 1198 (8th Cir. 1993)). Generally, deficiencies in application go to the weight of the evidence, not its admissibility. *See id.* "'As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.'" *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) (quoting *Hose v. Chicago Nw. Transp. Co.*, 70 F.3d 968, 976 (8th Cir. 1995)).

"[C]ases are legion" in the Eighth Circuit that "call for the liberal admission of expert testimony." *Johnson v. Mead Johnson & Co.*, LLC, 754 F.3d 557, 562 (8th Cir. 2014). "As long as the expert's scientific testimony rests upon 'good grounds, based on what is known' it should be tested by the adversary process with competing expert testimony and cross–examination, rather than excluded by the court at the outset." *Id.* (quoting *Daubert*, 509 U.S. at 590). "Vigorous cross-examination, presentation of contrary evidence, and

careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.  District courts are "not to weigh or assess the correctness of competing expert opinions." *Id.*  The jury, not the trial court, should be the one to 'decide among the conflicting views of different experts.'" *Kumho Tire,* 526 U.S. at 153.

"It is up to the opposing party to challenge the factual basis for an expert's opinion in cross-examination." *Bettisworth v. BNSF Ry. Co.*, 8:17-CV-491, 2020 WL 3498139, at *3 (D. Neb. June 29, 2020) (*citing Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001)).  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596.  "As long as the expert's scientific testimony rests upon 'good grounds, based on what is known' it should be tested by the adversary process with competing expert testimony and cross-examination, rather than excluded by the court at the outset." *Johnson v. Mead Johnson & Co., LLC,* 754 F.3d 557, 562 (8th Cir. 2014) (quoting *Daubert,* 509 U.S. at 590).

### B.  Analysis:

#### 1.  DTD's Motion to Exclude Kenedy Report and Testimony (Filing No. 92)

Kenedy's Report and related testimony are admissible because they may be helpful, reliable, and relevant, and criticisms of his opinion go to credibility, not admissibility.  A rebuttal expert's report and testimony are permissible to "contradict or rebut evidence on the same subject matter identified by another party." Fed. R. Civ. P. 26(a)(2)(D)(ii).  "The function of rebuttal testimony is to explain, repel, counteract or disprove evidence of the adverse party.  As such, rebuttal evidence may be used to

challenge the evidence or theory of an opponent—and not to establish a case-in-chief."
*Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 759 (8th Cir. 2006) (internal quotation marks and citations omitted).  The "same subject matter" requirement of Rule 26(a)(2)(C) does not mean that a rebuttal witness must meet an affirmative expert report with the same methodology.  *See TC Systems Inc. v. Town of Colonie, New York*, 213 F.Supp.2d 171, 179-81 (N.D.N.Y. 2002).

DTD moves to exclude Kenedy's Report because his $0.00 valuation of DTD's value was based on faulty methodology and was a litigation-oriented methodology with a predetermined result.  DTD's argument is essentially two-fold.  First, DTD argues that Kenedy's Report strayed from the subject matter of the Initial Report because he used an "asset approach" rather than Zandman and Zhou's "cash-flow" methodology.  However, Kenedy's reference to the asset approach was specifically a criticism of the Initial Report's use of the "cash-flow" methodology.  Kenedy explained that "[g]iven the uncertainty of Aprio's financial projections and [DTD's] risks as of the valuation date, I believe an asset approach would have been more appropriate."  Filing No. 98-11 at 8.  Kenedy pointed to DTD's downward sales trend, weak financial condition, and its customer concentration issues.  *Id.* at 5.  In addition to DTD's balance sheets and underlying accounting information, Kenedy's Report relied on DTD's officers' testimony that DTD had abandoned selling the Pocket Pistol—the only major product it sold.  Filing No. 98-11 at 7.  Based on this review, Kenedy opined that "the discounted future cash flow method to value [DTD] [was] overly speculative and inappropriate.  By June 2014, the Company was not producing positive cash flow and was highly distressed."  *Id.*  Thus, Kenedy's

11

reference to and use of the asset approach were direct criticisms of the Initial Report and were appropriate for purposes of a rebuttal report.

Second, DTD argues that Kenedy failed to consider evidence in reaching his own valuation of DTD at the time of the cease-and-desist letter and thus his opinion is unreliable. DTD argues that for Kenedy to make an appropriate valuation, Kenedy should have "communicate[d] with or ask[ed] questions of [DTD] management to determine future plans," "consult[ed] industry databases," and "assess[ed] or consider[ed] DTD's borrowing capacity or access to capital." Filing No. 93-1 at 8. To the extent DTD argues that Kenedy's Report is unreliable or inappropriate, DTD's argument is misplaced. Courts have noted that "a rebuttal expert who critiques another expert's theories or conclusions need not offer his own independent theories or conclusions (though of course his testimony may be more persuasive if he does so)." *Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, 829 F. Supp. 2d 802, 835 (D. Minn. 2011) (quoting *In re Cessna 208 Series Aircraft Prods. Liab. Litig.*, MDL No. 1721, 2009 WL 1649773, at *1 (D.Kan. June 9, 2009)). Kenedy critiqued Zhou/Zandman's use of the "cash-flow" method by concluding that an asset-based approach would be more appropriate given DTD's financial condition. It was not inappropriate for Kenedy to offer his own valuation based on this theory and any flaws in his application go to weight and credibility, not admissibility.

Moreover, the evidence shows that Kenedy considered extensive evidence in his rebuttal.[2] While Kenedy did not speak directly to DTD's management regarding the

---

[2] In creating his rebuttal report, Kenedy relied on the Initial Report; DTD's QuickBooks file; DTD's monthly balance sheets from 2012 through 2014; DTD's monthly income statements from 2012 through 2014; DTD's general ledger detail; DTD's bank statements from four bank accounts; email correspondence between DTD and Azimuth; depositions of Zaiser, Dufner, Taschner, and Kohout; the settlement agreement between DTD and Heizer Aerospace; and loss reports from DTD's products liability carrier and related complaints. Filing No. 98-11 at 10.

company's future, DTD's own expert spoke to DTD's management, and still failed to identify the future plans that may have strengthened their financial projections.  Despite DTD's allegations of future product developments, there is no evidence that any purchase orders or contracts were in place.  DTD does not attack Kenedy's qualifications, nor the selection of the asset approach as a valid valuation methodology.  In sum, DTD attacks the factual inputs in the methodology, which goes to the weight and credibility not admissibility.  Therefore, DTD's motion to exclude Kenedy's report and testimony is denied.

### 2.  Zhou's Testimony on the Initial Report (Filing No. 96)

Hornady moves to exclude Zhou's testimony on the Initial Report.  Hornady does not attack Zhou's qualifications as an expert but argues that the Initial Report (Filing No. 98-10) and Zhou's opinion based the Initial Report should be excluded because the report/opinion is so contrary to the record evidence as to render the report and opinion irrelevant.  Specifically, Hornady argues that Zhou's report did not consider the propensity of the first-generation Pocket Pistol to double strike, the drop in sales amounts from October 2013 to April 2014, the close out sale of the remaining Pocket Pistol inventory to Bill Hicks, and the close out sale price that prevented DTD from selling similar products for a significantly higher price.  Hornady also contends that Zhou failed to consider that DTD did not intend to continue to sell the Pocket Pistol, and had no engineering drawings, business plans, or prototypes for the Gen 2 design.  Hornady also argued that Zhou failed to consider that a co-inventor was listed on the utility patent.  Filing No. 96-1 at 7-10.

"As a general rule, 'the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility.'"  *In re Zurn Pex Plumbing Products Liab. Litig.,* 644

F.3d 604, 614 (8th Cir. 2011) (quoting *Bonner v. ISP Technologies, Inc.*, 259 F.3d 924, 929 (8th Cir. 2001)).  "Such testimony should be excluded only if it 'is so fundamentally unsupported that it can offer no assistance to the jury.'"  *Id.* (quoting *Bonner*, 259 F.3d at 929-30).  "Even a theory that might meet certain *Daubert* factors, such as peer review and publication, testing, known or potential error rate, and general acceptance, should not be admitted if it does not apply to the specific facts of the case."  *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056, 1057 (8th Cir. 2000) (excluding expert damages report that "ignored inconvenient evidence" contradicting hypothetical market).  "[N]othing in ... *Daubert* ... requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  *Children's Broadcast Corp. v. Walt Disney Co.*, 245 F.3d 1008, 1018 (8th Cir. 2001) (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

Hornady argues that the analytical gap between the data and Zhou's opinion is too great and renders Zhou's testimony inadmissible.  In holding that a district court may conclude that too great an analytical gap renders an opinion inadmissible, the Supreme Court did not attempt to define an appropriate gap.  *See Joiner*, 522 U.S. at 146.  However, in support of this statement, the Court cited to *Turpin v. Merrell Dow Pharmaceuticals*, Inc., 959 F.2d 1349, 1360 (6th Cir. 1992).  In *Turpin*, the Sixth Circuit held that an expert's opinion amounted to nothing more than personal opinion where "no understandable scientific basis is stated. Personal opinion, not science, is testifying here." *Turpin*, 959 F.2d at 1360.

It appears true that the Initial Report did not consider several factors such as the fact that DTD had no inventory of Pocket Pistols at the time of the cease-and-desist letter and there was no evidence of intent to continue producing them.  Further, her valuation did not consider the undeveloped and untested new polymer Gen 2 gun that would be limited in its pricing and had non-exclusive IP rights.  Nevertheless, the Court cannot say that Zandman/Zhou's Initial Report had no understandable scientific basis and amounted solely to personal opinion.  In reaching the opinion in the Initial Report, Zandman and Zhou analyzed the financial documents of DTD, had discussions with management, analyzed the pleadings and deposition testimony, accounted for additional expert opinion of Ray Reynolds, and conducted independent research using industry data.  Filing No. 98-14.

Hornady relies on *Children's Broadcast Corp. v. Walt Disney Co.*, 245 F.3d 1008 (8th Cir. 2001) and *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039 (8th Cir. 2000), but these cases are distinguishable.  In *Concord Boat* the expert testimony was excluded because it ignored inconvenient evidence that contradicted the hypothetical market.  207 F.3d at 1058.  The Eighth Circuit explained that the expert opinion "should not have been admitted because it did not incorporate all aspects of the economic reality of the stern drive engine market and because it did not separate lawful from unlawful conduct.  *Id.* Because of the deficiencies in the foundation of the opinion, the expert's resulting conclusions were mere speculation."  *Id.*  Similarly, the expert testimony in *Children's Broadcast* was excluded because the expert failed to include relevant facts in his valuation.  245 F.3d at 1018.  Thus, the expert's testimony was found to be unreliable, speculative, and based solely on conjecture.  *Id.*

15

Unlike the expert opinion in *Children's Broadcast* and *Concord Boat*, the Court cannot say at this stage that omissions in the Initial Report render the opinion wholly baseless or purely speculative.  While it did not include some facts in her analysis, DTD disputes whether those facts are relevant to the valuation.  Further, both Zandman and Zhou have made statements that may undermine their conclusions in the Initial Report. Hornady may attack these omissions through rigorous cross examination, but the Court cannot conclude at this stage that the valuation in the Initial Report was wholly unreliable or based purely on baseless speculation.

### 3.  Ray Reynolds Testimony (Filing No. 93)

The Court finds that the opinion of Ray Reynolds is admissible as relevant and reliable enough to pass muster under Rule 702 and *Daubert*.  Reynolds's opinion relates to the marketability of the Gen 2 polymer pistol.  He opines that DTD could sell in excess of 100,000 units of the Gen 2 pistol over a period of years in light of anticipated demand in the law enforcement market.

In moving to exclude Reynolds's testimony, Hornady relies primarily on *U.S. Salt, Inc. v. Broken Arrow, Inc.*, 563 F.3d 687 (8th Cir. 2009).  In *U.S. Salt*, the district court excluded testimony from both an expert and lay testimony from the president of U.S. Salt regarding damages.  563 F.3d at 688.  The court noted that the expert relied almost exclusively on the president's unsupported assumptions and estimates, the assumptions being "nothing more than optimistic projections." *Id.* at 689.  Because the expert had relied almost exclusively on the owner's estimates without independent verification and conducted little analysis of market conditions and revised report dramatically on damages, the Circuit affirmed exclusion of the expert's testimony.  *Id.* at 691.  The

president's lay testimony was also excludable because it was speculative and conjectural. *Id.* He failed to perform any analysis of a viable market for the expected product, and "he lacked relevant and recent activity in the . . . market." *Id.*

Hornady argues that Reynolds likewise lacked any basis or qualification. Reynolds is a retired police officer of twenty-four years, has owned and run various gun-related businesses throughout his life. Filing No. 105-2 at 3-5. Reynolds worked for Glock as second field sales manager for ten years, Beretta as national sales manager for law enforcement sales for one year, and Sig Sauer as vice president of sales for seven years. Filing No. 105-2 at 4. Reynolds served as a director of sales for DTD for approximately a year and a half. Filing No. 105-2 at 5. Reynolds based his projection of 100,000 sales for the Gen 2 polymer in part on his experience in the market, DTD's sales number of the First-generation pistol, DTD's patent and size and novelty as it would be the "only one of its kind," and industry reports on smaller-caliber firearms sales. Filing Nos. 98-4 at 7, 8, 10, 93-10 at 5, 6, 8. DTD has proven by a preponderance of the evidence that Reynolds is qualified to give his opinion and it would be relevant and helpful to the trier of fact. Unlike the owner in *US Salt*, Reynolds's involvement in the firearm industry is extensive and continuous. His opinion on the sales of the Gen 2 polymer gun satisfies the *Daubert* standard and Rule 702 standard and is admissible. Any faults in his conclusions or opinions may be addressed through cross examination.

### 4. DTD's Supplemental Report (Filing No. 95)

Hornady's motion to strike the out-of-time Supplemental Report is granted because DTD failed to provide good cause for the delay and admission of the Supplemental Report is neither substantially justified nor harmless. Hornady moves to strike the Supplemental

Report pursuant to Federal Rules of Civil Procedure 16(b), 26(a)(2), and 37(c)(1). Hornady argues that the Supplemental Report is actually a new report—subject to automatic exclusion under Rule 37(c)(1). DTD argues the Supplemental Report is a proper and timely supplemental report under FRCP 26(e). In the alternative, DTD argues that if the Court finds that the Supplemental Report is a new report, it was substantially justified or harmless and the Court should exercise discretion in fashioning a lesser sanction than exclusion.

To determine whether the supplemental report is admissible, the Court is bound by the Eighth Circuit's opinion in *Petrone v. Werner Enterprises, Inc.*, 940 F.3d 425 (8th Cir. 2019). In *Petrone*, discovery related to plaintiffs' expert "revealed considerable flaws in the methodology" used to calculate damages. *Id.* at 432. Plaintiffs attempted to correct these errors through a supplemental report from their expert. *Id.* Although designated as supplemental, the report significantly altered the damages calculation, so it was designated as a new, distinct report. *Id.* The district court did not find good cause to extend the deadline for the new report but, relying on Rules 1 and 37(c)(1), permitted plaintiffs to file it because the information was useful and necessary to the merits of the case. *Id.* at 433. The district court permitted defendants to depose the plaintiffs' expert at plaintiffs' expense and awarded defendants costs incurred by virtue of the late submission of the report. *Id.* at 433. The Eighth Circuit held that the district court erred in modifying the progression order without good cause. *Id.* at 434. The court reasoned that under Rule 16(b)(4), "a schedule may be modified only for good cause and with the judge's consent," and explained that the "good-cause standard is not optional." *Id.* (citations and quotations omitted).

18

Similar to the plaintiffs in *Petrone*, DTD has failed to show good cause to extend the deadline for its Supplemental Report. Like the report in *Petrone*, the Supplemental Report is new, distinct report under Rule 26(a), not a supplemental report under Rule 26(e). Supplementation of an expert report under Rule 26(a) "means correcting inaccuracies or filling the interstices of an incomplete report based on information that was not available at the time of the initial disclosure." *Keener v. United States*, 181 F.R.D. 639, 640 (D. Mont. 1998). In *Petrone*, the Circuit found that the supplemental report was "more appropriately characterized as a new, distinct report." 940 F.3d at 434. The Circuit noted that "[a]lthough Plaintiffs' motion framed the revised expert report as a mere supplement under Rule 26(e), Plaintiffs' expert was materially altering, not merely clarifying his original report." *Id.* (quoting *Williams v. TESCO Servs., Inc.*, 719 F.3d 968, 976 (8th Cir. 2013)). The Circuit also reasoned "[t]here [was] no evidence that Plaintiffs subsequently learned of information that was previously unknown or unavailable to them." *Id.*

Similar to *Petrone*, the information contained in the "supplemental report" was known to DTD prior the initial expert report. Information supporting the original report included approximately three discussions with Marvin Dufner, the sole member of DTD. Filing Nos. 98-10 at 24, 25, 98-5 at 6-7. Dufner was aware of the possibility of the Gen 2 redesign in 2013 and was aware of the Gen 2 potential when consulted for Zhou's original report. Filing No. 98-18 at 1. Thus, through Dufner, Zandman and Zhou had access to information about the Gen 2 pistol at the time of the original report, but the report does not mention the Gen 2 redesign. The Supplemental Report significantly alters the basis of the valuation, increasing the value of DTD from $4,072,000 to $15,600,000 and there

is no evidence that this dramatic increase was based on information previously unknown to DTD.  Accordingly, DTD's Supplemental Report is actually a new report under Rule 26(e) because it materially altered the original report and did not "merely clarify" the original report.[3]

Since the report is "new" and not supplemental, it is subject to the expert disclosure guidelines in Rule 26(a), and by the Rule 16(b) scheduling order set by the Court.  In the Second Amended Progression Order, the magistrate judge set the deadline for complete expert disclosures for the plaintiff as April 28, 2020, defendant May 28, 2020, and the plaintiff rebuttal as June 11, 2020.  Filing No. 70 at 2.  Through various extensions and stipulations, the defendant's expert disclosure date was extended to July 31, 2020, and plaintiff's rebuttal to August 14, 2020.  Filing No. 76.  On October 7, 2020, without objection, the magistrate granted DTD leave to serve any additional or supplemental expert report by October 14, 2020.  Filing Nos. 88 and 107 at 6.[4]  DTD's report was submitted on October 14, 2020.  Filing No. 89.  The report was filed two months after the last possible deadline for a new expert report.  Moreover, unlike the plaintiffs in *Petrone*, DTD has not even attempted to move[5] for an amended scheduling order under Rule

---

[3] "The supplemental report doubly violates Rule 26(e) by enriching the initial expert report with detail that was admittedly available to Plaintiff's expert at the time she drafted the initial expert report." *Martinez v. Costco Wholesale Corp.*, 336 F.R.D. 183, 189 (S.D. Cal. 2020)

[4] Magistrate Judge Zwart's order required plaintiff to file any additional or supplemental report by October 14, 2020. DTD classified their report as supplemental and submitted on October 14. The report was not supplemental and therefore, must have been submitted by the original plaintiff deadline of April 28, 2020, or at the absolute latest August 14, 2020 as a plaintiff rebuttal disclosure. Neither party argues that the October 7, 2020, order, Filing No. 88, modifies the expert disclosure date, and the Court declines to interpret it as such.

[5] Plaintiff references *Hairston v. Alert Safety Light Products, Inc.*, 307 F.3d 717 (8th Cir. 2002) and *MacGregor v. Mallinckrodt*, 373 F.3d 923 (8th Cir. 2004), for the proposition that "prejudice is an essential finding before sanctions can be imposed." Filing No. 107 at 13.  *Hairston* does not apply to this situation as that was a sanction of dismissal of the case for failure to show for a deposition, whereas in this case, the Rule 37 sanction of exclusion of a late disclosed expert report is self-executing. Additionally, the Court finds no support for the proposition that a showing of prejudice is an essential finding before the sanction can be imposed in *MacGregor*. The Rule 37 discussion in *MacGregor* related to the plaintiff failing to answer

16(b).[6]  Accordingly, the report violates the Rule 16(b) scheduling order and is subject to exclusion under Rule 37(c)(1).[7]

The late disclosure of the expert report is not harmless.  In evaluating whether the late disclosure was harmless, the Court looks to the prejudice caused by the late disclosure.  The Court "considers several factors in determining whether a Rule 26 violation is justified or harmless, including: (1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness."  *Rodrick v. Wal-Mart Stores East, L.P.*, 666 F.3d 1093, 1096-97 (8th Cir. 2012).  In *Rodrick*, the trial court found the expert's report did not comply with Rule 26(a)(2) but found its admission harmless because it caused no surprise or prejudice to the plaintiff.  *Rodrick*, 666 F.3d at 1096.  The report had been revealed to the other party a year and half prior to the trial, the report was never offered or received into

---

discovery requests, not the late disclosure of an expert report. *MacGregor*, 373 F.3d at 934. The late disclosure of the expert report is not substantially justified.

[6] "A schedule may be modified only for good cause and with the judge's consent." *Petrone*, 940 F.3d at 434 (quoting Fed. R. Civ. P. 16(b)(4)). "To establish good cause, a party must show its diligence in attempting to meet the progression order." *Id.* Plaintiff has not moved to amend the scheduling order. Even if Plaintiff had moved, Plaintiff fails to offer any reasoning that demonstrates good cause for extending the schedule.

[7] Rule 37(c)(1) of FRCP:

> (c) Failure to Disclose, to Supplement an Earlier Response, or to Admit.

> (1) Failure to Disclose or Supplement. If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:

> (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;

> (B) may inform the jury of the party's failure; and

> (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

evidence, and the testimony was limited to the expert's examination and personal observations of the plaintiff. *Id.* at 1097.

Unlike the report in *Rodrick*, the Supplemental Report is not a harmless late disclosure. Although Hornady was aware of a pending supplemental report prior to its deposition with Zhou, there is no evidence that the report would nearly triple Zhou's valuation estimate. Filing No. 107 at 16. Hornady is permitted to rely the Court's progression order and DTD's expert disclosures. If the Supplemental Report is not excluded, Hornady would certainly need to depose Zhou again, and that alone would cause the late disclosure to not be harmless. In addition, it could cause further delay to the trial and further depositions of fact witnesses. The late disclosure of the Supplemental Report is neither substantially justified nor harmless.

Because the new expert report, disguised as a Supplemental Report, was late under Rule 26(a), and was neither substantially justified nor harmless, exclusion under Rule 37(c)(1) is the only sanction available. DTD argues that lesser sanctions should be imposed, but DTD has not made a motion for lesser sanctions, as required by Rule 37. The Court may not exercise the "discretion" that DTD claims the Court has. Instead, the Court is bound by *Petrone*, and DTD may not submit the new report out of time without good cause shown. Accordingly, Hornady's motion to strike the Supplemental Report is granted.

## II.   Motions for Summary Judgment

### A.  Law:

Summary judgment is appropriate when, viewing the facts and inferences in the light most favorable to the nonmoving party, "the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "The movant 'bears the initial responsibility of informing the district court of the basis for its motion, and must identify 'those portions of [the record] ... which it believes demonstrate the absence of a genuine issue of material fact.'" Torgerson v. City of Rochester, 643 F.3d 1031, 1042, (8th Cir. 2011) (en banc) (quoting Celotex, 477 U.S. at 323).  If the movant does so, "the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing that there is a genuine issue for trial.'" Id. (quoting Celotex, 477 U.S. at 324).

The evidence must be viewed in the light most favorable to the nonmoving party, giving the nonmoving party the benefit of all reasonable inferences. Kenney v. Swift Transp., Inc., 347 F.3d 1041, 1044 (8th Cir. 2003).  If "reasonable minds could differ as to the import of the evidence," summary judgment should not be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986).  "In ruling on a motion for summary judgment, a court must not weigh evidence or make credibility determinations." Id.

### 1. Plaintiff's Motion for Partial Summary Judgment (Filing No. 94)

DTD moved for partial summary judgment, Filing No. 94, on Hornady's liability under the trademark and licensing agreement executed by the parties.  DTD argues that in the Agreement "Hornady expressly agreed to indemnify, defend, protect, and hold harmless DTD from all claims, demands, and/or lawsuits with respect to licensee DTD's liability related to trademark infringement claims for its use of the marks." Filing No. 94-1 at 7.  Additionally, DTD argues that Hornady breached the agreement because Hornady failed to honor its indemnification and hold harmless obligations when Hornady did not

respond to DTA's cease-and-desist letter.  Hornady disputes DTD's characterization of the Agreement, arguing that the ambiguous language in the indemnity provision creates a question of fact about whether Hornady had a duty to indemnify DTD against trademark infringement claims.  For the reasons discussed below, DTD's Motion for Partial Summary Judgment, Filing No. 94, will be granted, in part, and the Court concludes that Hornady had an unambiguous duty to indemnify DTD against trademark infringement claims. Whether Hornady breached that duty remains an issue for the trier of fact.

A breach of contract claim under Nebraska law requires (1) the existence of a promise, (2) its breach, (3) damage, and (4) compliance with any conditions precedent that activate the defendant's contractual duty.  *Phipps v. Skyview Farms, Inc.*, 610 N.W.2d 723, 730 (Neb. 2000).  "A contract must receive a reasonable construction and must be construed as a whole, and if possible, effect must be given to every part of the contract." *Acklie v. Greater Omaha Packing Co., Inc.*, 944 N.W.2d 297, 305 (Neb. 2020).  "A court interpreting a contract must first determine as a matter of law whether the contract is ambiguous." *Silverleaf Investments, LLC v. Devastator Real Est., LLLP*, 943 N.W.2d 454, 458 (Neb. App. 2020) (citing *Davenport Ltd. Partnership v. 75th & Dodge I, L.P.*, 780 N.W.2d 416 (Neb. 2010).  A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings. *City of Sidney v. Municipal Energy Agency of Neb.*, 917 N.W.2d 826, 844 (Neb. 2018).  A contract written in clear and unambiguous language is not subject to interpretation or construction and must be enforced according to its terms.  *Id.* "[T]he meaning of a contract and whether a contract is ambiguous are questions of law." *Frohberg Elec. Co. v. Grossenburg Implement, Inc.*, 900 N.W.2d 32, 37 (Neb. 2017).

24

"Construction of an unambiguous contract is 'a question of law appropriate for summary judgment.'" *Windstream Corp. v. Da Gragnano*, 757 F.3d 798, 803 (8th Cir. 2014).

The relevant language of the Agreement is unambiguous.  The Agreement created a promise by Hornady to indemnify, defend, protect, and hold harmless DTD from liability related to trademark infringement claims, and Hornady breached that promise by failing to respond to the cease-and-desist letter.   The language in Section 7 is also unambiguous.  In exchange for a licensing fee and other consideration, Hornady agreed to license the DOUBLETAP Mark back to DTD and

> "INDEMNIFY, DEFEND, PROTECT, AND HOLD HARMLESS [DTD] . . . FROM AND AGAINST ALL CLAIMS, DEMANDS, LAWSUITS, DAMAGES, LIABILITIES, JUDGMENTS, COSTS, AND EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES) ARISING FROM OR RELATING TO A PARTY'S BREACH OF THIS AGREEMENT. . . ; OR, **WITH RESPECT TO LICENSEE**, LIABILITY RELATED TO TRADEMARK INFRINGEMENT CLAIMS FOR ITS USE OF THE MARKS AS CONTEMPLATED BY THIS AGREEMENT."

Filing No. 45-1 at 5-6 (emphasis added).

Section 7 requires that each party shall indemnify the other party from several potential disputes arising from the Agreement.  The duty to indemnify applies equally, to both parties, for all types of claims but one: liability related to trademark infringement.  Related to trademark infringement claims, the Agreement narrows the duty to indemnify to only one of the parties.  In the Agreement, Hornady is the Licensor of the DOUBLETAP Mark and DTD is the Licensee.  Filing No. 45-1 at 2.   Section 7 states that "WITH RESPECT TO LICENSEE," the duty is owed for infringement claims arising for "its" use of the DOUBLETAP Marks.  This section covers only one party's use of the Marks, so the duty to indemnify arises only for the other party.  The only reasonable interpretation of

25

this language is that Hornady owes DTD, the Licensee, a duty to indemnify against trademark infringement claims arising from DTD's use of the DOUBLETAP Marks.

This reading is further supported by the purpose and structure of the Agreement. The duty to indemnify against trademark infringement claims arises from Licensee's use of the Marks "as contemplated by this Agreement." Filing No. 45-1 at 5-6. It is undisputed that the purpose of the Agreement was to resolve a trademark dispute between Hornady and DTD, and for DTD to use the Marks as a non-exclusive licensee. It would not make sense for DTD (as a non-exclusive licensee) to indemnify Hornady (as the licensor) for using the Marks as contemplated by the Agreement. Filing No. 44 at 9.

Although the Agreement requires Hornady to indemnify DTD for liability related to trademark infringement claims, the Court does not conclude that Hornady breached the Agreement by failing to respond to DTA's cease-and-desist letter. Under the plain language of the Agreement, the unilateral duty to indemnify for trademark infringement arises when the Licensee's use of the Marks subjects it to "LIABILITY RELATED TO TRADEMARK INFRINGEMENT CLAIMS." Filing No. 45 at 6. In other words, the duty to indemnify for trademark infringement arises only when liability attaches. DTD produced no evidence that it incurred actual liability to DTA. At the time DTD received the cease-and-desist letter from DTA, it had stopped selling the Gen 1 Pocket Pistol and there are factual issues as to whether DTD had a viable way to sell the Gen 2 pistol. Without an infringing product to sell, DTD faced no liability to DTA, and the duty to indemnify may not have attached. DTD argues that the cease-and-desist letter was the reason it stopped selling the Gen 1 Pocket Pistol. However, there is conflicting evidence about whether this

decision was even related to the cease-and-desist letter.[8]   Accordingly, there remain questions of fact at least as to whether liability attached and whether Hornady breached its duty to indemnify.

### 2.  Hornady's Motion for Summary Judgment (Filing No. 97)

Hornady's Motion for Summary Judgment is denied because there remains a question of fact as to whether Hornady's breach of the Agreement caused any damages to DTD.  Hornady argues that DTD must prove that Hornady's breach of the Agreement was the proximate cause of the damages.   There are disputed facts as to whether Hornady's failure to indemnify or hold harmless DTD upon receipt of DTA's cease-and-desist letter caused the damages.  As noted above, the record provides facts that indicate on one hand, DTD had sold its inventory at a discount prior to receiving DTA's cease-and-desist letter, and that the Gen 2 pistol was not sufficiently developed as a concept to form a non-speculative basis for valuation.   On the other hand, DTD submits evidence showing its intent to produce a polymer version of the firearm, including the hiring two engineers.  *See* Filing No. 93-3 at 6, 93-3 at 6-7.  When viewing the evidence in the light most favorable to the non-moving party, summary judgment is not appropriate because there is a disputed question of fact as to whether the breach caused any damages to DTD.

Summary judgment is not appropriate on the question of damages, because there is a dispute as to the value of DTD. As discussed in prior sections of this order, there remain disputed valuations of DTD on the date of the cease-and-desist letter.   DTD's

---

[8] *See* Filing No. 98-1 at 106:16–19, 107:7–16, 110:10–114:2, 115:18–116:5, 116:11–117:18, 118:15–21; Filing No. 98-2 at 22:3–23:25, 58:19–60:23, 91:7–92:1, 107:13–20, 116:24–117:21, 123:8–16, 126:25–127:8, 129:7–133:8, 138:22–139:10, 142:6–16, Filing No. 98-4 at 39:3–40:1, 42:2–23, 49:1–5; Filing No. 98-5 at 119:4–122:8.

expert Zhou's original report provides a valuation of $4,072,000, and Hornady's expert Kenedy provides a valuation of $0.  At this stage, both of these experts satisfy the *Daubert* and Rule 702 standard, and with competing valuations, there remains a genuine issue of material fact as to the value of DTD.  Therefore, summary judgment is not appropriate on the question of causation or damages.   Hornady's motion for summary judgment is denied.

## CONCLUSION

Consistent with this Memorandum and Order:

IT IS ORDERED:

1.  Plaintiff's Motion to Exclude (Filing No. 92) is denied,

2.  Plaintiff's Motion to exclude (Filing No. 93) is denied,

3.  Plaintiff's Motion for Partial Summary Judgment (Filing No. 94) is granted, in part, consisted with this Memorandum and Order,

4.  Defendant's Motion to Strike (Filing No. 95) is granted,

5.  Defendant's Motion to Exclude (Filing No. 96) is denied, and

6.  Defendant's Motion for Summary Judgment (Filing No. 97) is denied.

Dated this 17th day of August, 2021.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge

28