IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| DOUBLETAP DEFENSE, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>HORNADY MANUFACTURING CO.,<br><br>Defendant. | Case No. 8:18-cv-492<br><br>**ORDER ON<br>FINAL PRETRIAL<br>CONFERENCE** |

A final pretrial conference was held on the 21st day of September, 2021. Appearing for the parties as counsel were:

Robert J. Kaufman and Eric M. Underriner for DoubleTap Defense, LLC

Andre R. Barry and Nathan D. Clark for Hornady Manufacturing Co.

(A)   Exhibits.  See attached Exhibit List. The parties stipulate and agree, as set forth in section (I) below, that they will list their respective objections to exhibits in the Exhibit List no later than October 1, 2021.

Caution:  Upon express approval of the judge holding the pretrial conference for good cause shown, the parties may be authorized to defer listing of exhibits or objections until a later date to be specified by the judge holding the pretrial conference.  The mere listing of an exhibit on an exhibit list by a party does not mean it can be offered into evidence by the adverse party without all necessary evidentiary prerequisites being met.

(B)   Uncontroverted Facts.  The parties have agreed that the following may be accepted as established facts for purposes of this case only:

The parties have agreed that the following may be accepted as established facts for purposes of this case only:

1. Plaintiff DoubleTap Defense, LLC (hereinafter, "DTD") is a limited liability company organized under the laws of Georgia. Its only member is a citizen of Missouri.

2. Defendant Hornady Manufacturing Co. is a corporation organized under the laws of Nebraska, with its principal place of business is in Grand Island, Nebraska.

3. The amount in controversy in this dispute, exclusive of interest and costs, exceeds seventy-five thousand dollars.

4. Hornady conducts business within the geographical boundaries of this district, and a substantial part of the events or omissions giving rise to DTD's claims occurred in this district.

5. DTD was formed as Heizer Technologies, LLC in or about late 2010 or 2011 by Marvin Dufner and Ray Kohout and later renamed as DoubleTap Defense, LLC.

6. Hornady is a manufacturer of ammunition for sportsmen, law enforcement, and military professionals. The Court has jurisdiction over Hornady because it is a citizen of the State of Nebraska with its principal place of business located within the District of Nebraska.

7. On December 22, 2010, Central Holding Corporation filed a trademark application with the USPTO under Serial No. 85-204480 seeking registration of the trademark "DOUBLETAP" in connection with firearms—specifically, "pistols".

8. On June 11, 2012, CHC assigned the Application in the mark to Heizer Technologies, LLC. At and before the 2012 SHOT Show, a national firearms tradeshow, DTD used the DOUBLETAP trademark to promote the forthcoming DoubleTap Tactical Pocket Pistol (the "Pocket Pistol") it intended to manufacture and sell.

9. The DOUBLETAP mark is permanently etched into the Pistol's barrel and its frame above the grip panel.

10. Some of Hornady's ammunition products bear its registered TAP mark, under which Hornady has sold various products since 1997.

11. To protect this TAP mark, Hornady sued two unrelated entities—DTD and Double Tap Ammunition, Inc. ("DTA")—for trademark infringement.

12. Hornady sued DTA on January 5, 2011, see Hornady Manufacturing Company, Inc. v. Double Tap Ammunition, Inc., No. 2:11-cv-00018-TS (D. Utah), and sued DTD on or about June 11, 2012 [see Hornady Manufacturing Company v. Heizer Firearms, LLC, et al., No. 2:11-cv-3117-WKU-CRZ (D. Neb.).

13. Hornady and DTD resolved their dispute in the District Court of Nebraska through execution of a Trademark Assignment and License Agreement (the "Agreement"), effective March 13, 2013.

14. Under the terms of the Agreement, DTD agreed to assign to Hornady all right, title and interest in the DOUBLETAP Marks, to cause all other parties claiming an interest in the DOUBLETAP Marks to assign all such interest to Hornady, to abandon its registration application, and to pay Hornady a $25,000 license fee.

15. The Agreement also contained an indemnification provision, the meaning of which the parties dispute:

> SECTION 7. INDEMNIFICATION. EACH PARTY SHALL INDEMNIFY, DEFEND, PROTECT, AND HOLD HARMLESS THE OTHER PARTY AND ITS OFFICERS, DIRECTORS, OWNERS, MEMBERS AND EMPLOYEES FROM AND AGAINST ALL CLAIMS, DEMANDS, LAWSUITS, DAMAGES, LIABILITIES, JUDGMENTS, COSTS, AND EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES) ARISING

FROM OR RELATING TO A PARTY'S BREACH OF THIS AGREEMENT; OPERATION OF ITS BUSINESS, ITS DESIGN, MANUFACTURE, SALE OR DISTRIBUTION OF ANY PRODUCT AND/OR SERVICES, THE ACT OF ANY EMPLOYEE, AGENT, OR PRINCIPAL CONNECTED WITH ITS BUSINESS; ITS OBLIGATIONS UNDER THIS AGREEMENT; ANY LIABILITY RESULTING FROM THE USE OR MISUSE OF ANY PRODUCT AND/OR SERVICES BY ANY END USER OF SUCH PRODUCT AND/OR SERVICES; OR, WITH RESPECT TO LICENSEE, LIABILITY RELATED TO TRADEMARK INFRINGEMENT CLAIMS FOR ITS USE OF THE MARKS AS CONTEMPLATED BY THIS AGREEMENT. THE INDEMNIFIED PARTY SHALL RETAIN THE RIGHT TO SELECT ITS COUNSEL IN THE EVENT THE INDEMNIFIED PARTY IS THREATENED WITH OR JOINED IN ANY ACTION ARISING FROM THE INDEMNIFYING PARTY'S ACTIONS OR INACTION.

16. Paragraph 10 of the Agreement provides that DTD shall promptly notify Hornady of any and all infringements, imitations, simulations or other illegal use or misuse of the "Marks", as that term is defined in the Agreement and that Hornady shall determine whether to take any action to prevent such use or misuse.

17. Following execution of the Agreement, DTD alerted Hornady to the existence of at least three other businesses using the DOUBLETAP Mark and requested that Hornady, pursuant to the terms of the Agreement, address these activities.

18. On or about March 7, 2013, Hornady transmitted cease-and-desist letters to companies which DTD informed Hornady were using the DOUBLETAP Mark.

19. DTD abandoned its registration of the Mark in March 2013.

20. Hornady continued to litigate with DTA regarding the DOUBLETAP Mark. The U.S. District Court for the District of Utah and the

U.S. Court of Appeals for the Tenth Circuit ultimately held that DTA's unregistered mark did not infringe on Hornady's TAP mark.

21. DTD was formed to produce Kohout's concept of a Derringer-style, two-barrel concealable firearm that would fire single shots out of each barrel through successive "double tap" trigger pulls (the "Pocket Pistol").

22. Kohout has experience in the firearm sales industry. He does not have a formal education in engineering or firearm design.

23. DTD promoted the Pocket Pistol as being available in either .45 ACP or 9 mm, and in either a titanium or aluminum frame.

24. The Pocket Pistol carried two rounds and housed two additional rounds in its integral grips.

25. While Kohout had knowledge about designing firearms, Dufner did not. Dufner's role at DTD was to provide capital and contribute his experience in running businesses.

26. DTD was capitalized by Dufner either directly through personal loans, or by bank loans he personally guaranteed.

27. Kohout patented his idea for the trigger mechanism of the Pocket Pistol and that patent was assigned to DTD.

28. DTD initially intended to have the Pocket Pistol manufactured by Heizer Defense, LLC, but that relationship ended before production began.

29. Heizer Defense, and associated companies and individuals, were party to a dispute with DTD concerning intellectual property rights in the Pocket Pistol, which ended with a settlement agreement in which Charles Heizer was added as a co-inventor to DTD's utility patent.

30. DTD partnered with Azimuth Technologies to produce the Pocket Pistol. Pursuant to this agreement, Azimuth would manufacture the

Pocket Pistols and DTD would purchase them from Azimuth as needed at approximately $170 per unit for resale to distributors.

31. In total, Azimuth manufactured 23,000 to 25,000 Pocket Pistols under a single purchase order from DTD for 25,000 aluminum-frame Pocket Pistols.

32. As DTD and Azimuth developed the Pocket Pistol, they became aware that the Pocket Pistol had the potential to "double strike," meaning the pistol would fire both barrels simultaneously in response to one trigger pull. The parties do not agree on whether this potential was due to the use of incorrect ammunition or whether it was due to a problem with the Pocket Pistol's design.

33. DTD began shipping Pocket Pistols for retail sale in or about late May or early June 2013.

34. Although the price for a Pocket Pistol ranged depending on the model and features, DTD sold the Pocket Pistol to distributors on average for approximately $400.

35. Soon after the Pocket Pistol's launch DTD began to receive customer complaints of double strikes, which continued into August 2013 despite an attempted adjustment to the firing spring. The parties dispute whether these reports reflect the use by consumers of incorrect ammunition or whether they reflect a problem with the Pocket Pistol's design.

36. By October 2013, DTD and Azimuth had been in discussions about the complaints of double strikes. DTD decided to temporarily suspend shipping until the cause of the problem was identified and a solution implemented.

37. As late as December 2013, DTD was considering a recall and engaging in plans to replace components of Pocket Pistols that had already shipped. DTD opted not to do a recall.

38. DTD's earnings in its first twelve months of selling the Pocket Pistol are set out in the below table, with losses designated by parentheses:

| Month | Sales Revenue | Gross Profit | Net Income |
| --- | --- | --- | --- |
| May 2013 | $130,317 | $54,311 | $(23,950) |
| June 2013 | $736,004 | $322,355 | $245,718 |
| July 2013 | $1,493,327 | $689,957 | $605,444 |
| August 2013 | $1,481,248 | $482,862 | $473,350 |
| September 2013 | $1,118,994 | $40,173 | $336,580 |
| October 2013 | $81,771 | $40,173 | $(85,482) |
| November 2013 | $90,662 | $22,605 | $(139,130) |
| December 2013 | $119,307 | $49,394 | $(17,431) |
| January 2014 | $26,849 | $1,850 | $(174,999) |
| February 2014 | $20,370 | $(14,701) | $(93,541) |
| March 2014 | $60,767 | $16,385 | $(41,890) |
| April 2014 | $6,880 | $8,860 | $(72,578) |

39. By April 2014, DTD was seeking to sell its remaining inventory of its original Pocket Pistol, referred to by DTD as the "Gen 1" design, and did not intend to produce pistols with that same design any longer.

40. DTD entered into an agreement with Azimuth in which 6,000 guns of the remaining inventory of 8,300 guns which DTD had not yet purchased from Azimuth would be sold to Bill Hicks & Co., Ltd., a leading national wholesale distributor of firearms.

41. The DTD–Azimuth agreement provided that DTD would sell 6,000 pistols to Bill Hicks for $200.00 per Pocket Pistol, and that it would pay Azimuth $50.00 per Pocket Pistol plus $5.00 in consideration of excise tax.

42. The sale to Bill Hicks was negotiated in April 2014, and Bill Hicks ultimately purchased about 4,500 guns, which were ordered and shipped in May 2014.

43. The remaining guns after the Bill Hicks sale were largely sold to Chattanooga Shooting Supply directly by Azimuth, and at this time DTD has virtually no inventory of Pocket Pistols remaining.

44. The Bill Hicks sale with DTD was handled by Bill Hicks's Merchandise Manager and Senior Purchasing Agent, Matthew Taschner.

45. Taschner purchased the Pocket Pistols with the intention of selling them to retailers at approximately $250 but after selling some at that price initially was only able to sell the balance at $150.

46. As early as mid-2013, DTD considered manufacturing a second-generation model of its Pocket Pistol, which was referred to by DTD as the "Gen 2".

47. DTD was considering manufacturing the Gen 2 models in at least three versions: aluminum, titanium, and polymer.

48. DTD communicated with Azimuth in November 2013 regarding the metal-frame versions of the Gen 2, and discussed potential changes, including a redesigned the trigger mechanism.

49. Kohout does not recall if those discussions with Azimuth progressed beyond November 2013, and he does not recall if he ever received CAD drawings for the metal-frame Gen 2 from Azimuth.

50. In November 2013, Ray Kohout met and otherwise communicated with Paul Reed of Nordon Inc. They discussed the following issues regarding the manufacture of a polymer frame Pocket Pistol: a) approximate unit cost, b) mold development and manufacturing cost, c) approximate time frames for production, and d) production runs.

51. In November 2013, Mr. Kohout also met with Tom Pierce, an engineer.

52. DTD did not ever produce a prototype of the Gen 2 in either a polymer or metal frame.

53. On or about June 9, 2014, DTA sent a cease-and-desist letter to DTD alleging that DTD's use of DOUBLETAP Mark infringed on DTA's unregistered mark.

54. On or about June 13, 2014, DTD provided the DTA cease-and-desist letter to Hornady.

55. In correspondence from DTD's counsel accompanying the DTA cease-and-desist letter, dated June 13, 2014, DTD stated:

> Pursuant to Section 7 of the Agreement, Hornady has a responsibility to "indemnify[,] defend, protect, and hold harmless the other party . . . from and against all claims, demands, lawsuits, damages, liabilities, judgments, costs and expenses (including reasonable attorneys' fees) arising from or relating to . . . with respect to the licensee, liability related to trademark infringement claims for its use of the marks as contemplated by [the] Agreement." Accordingly, our clients are seeking to invoke this protection in light of the demand letter and court orders referenced above.

56. On June 20, 2014, counsel for Hornady wrote to counsel for DTD stating Hornady's belief that it had no indemnity obligation in connection with DTA's claim and that DTD would be responsible to defend itself.

57. DTA never filed a complaint against DTD alleging trademark infringement, or any other claim relating to DTD's use of the Marks as defined in the Agreement, or initiated any other type of legal action against DTD.

58. No judgment, or any other form of enforceable legal obligation, has been entered against or imposed upon DTD and in favor of DTA on the basis of any claim for trademark infringement, or any other claim relating to DTD's use of the Marks as defined in the Agreement.

59. DTD has not paid any sum to DTA, in settlement of any asserted claims or demands or for any other reason in connection with DTA's June 9, 2014 cease-and-desist letter.

60. On June 7, 2018, DTD filed a Complaint alleging Hornady breached the Agreement and filed a First Amended Complaint on June 8, 2018.

61. The parties stipulate and agree to the authenticity of each and every exhibit included in the exhibit list submitted to the Court in their joint proposed Final Pretrial Conference Order.

62. The parties stipulate and agree that Marvin Dufner, Raymond Kohout, Raymond Reynolds, Matthew Taschner, Yijun Carrie Zhou, and Lenoir Zaiser IV or each more than 100 miles from the place of trial and such absence was not procured by any party.

(C) Controverted and Unresolved Issues. The issues remaining to be determined and unresolved matters for the court's attention are:[1]

1. <u>Breach of Duty.</u>

    a. DTD Proposes: Whether Hornady's failure to indemnify and/or protect DTD from liability, damages, or claims arising from, *inter alia*, "the operation of its business" in accordance with Section 7 of the Agreement is a breach.

    b. Hornady Proposes: Whether Hornady's refusal of DTD's request for indemnification was a breach of Section 7 of the Trademark Assignment and License Agreement ("Agreement") as it pertained to liability for trademark infringement claims—specifically, whether DTD incurred liability to Double Tap Ammunition, Inc. ("DTA") that triggered an indemnity obligation on the part of Hornady under Section 7 of the Agreement.

---

[1] The scope of the breach of duty and causation issues before the court is a subject of ongoing debate. The parties' respective positions on these issues will be addressed in the parties' trial briefs.

10

2. <u>Causation.</u>

a. DTD Proposes: Whether Hornady's alleged breach of the Agreement in refusing DTD's request for indemnification and/or protection was the proximate cause of the damages DTD is alleged to have suffered.

b. Hornady Proposes: Whether Hornady's alleged breach of the Agreement in refusing DTD's request for indemnification for liability related to trademark claims was the proximate cause of the damages DTD is alleged to have suffered.

3. <u>Damages.</u>

a. DTD Proposes: Whether DTD has proven damages proximately caused by Hornady's breach of the Agreement exclusive of attorney's fees. Plaintiff's expert witness has opined that the damages proximately caused from Hornady's breach reflects the loss of 100% of the fair market equity of DTD, which was $4,072,000.00. Defendant's expert witness has opined that the damages are $0.00.

b. Hornady Proposes: The damages, if any, which DTD has proven with reasonable certainty.

4. <u>Attorney's Fees.</u>

a. Whether DTD is entitled to attorney's fees as an element of damages under Section 7 of the Agreement.

b. The amount of attorney's fees, if any, incurred by DTD as a proximate result of Hornady's alleged breach of Section 7 of the Agreement.

c. Whether a substantially prevailing party in this case is entitled to attorney's fees under Section 11.4 of the Agreement.

5. <u>Mitigation of Damages.</u>

  a. DTD Proposes:  Whether the provisions of the Agreement itself precluded DTD from defending the claim, as it no longer owned the naming and trademark rights at the time the claim arose.

  b. Hornady Proposes:  If the Court finds that DTD has proven breach, causation, and damages, as set forth above, whether and to what extent DTD failed to take reasonable steps to minimize its damages by rebranding its products or negotiating a license with DTA, and the amount of DTD's alleged damages that could have been avoided if it had done so.

(D) Witnesses.  All witnesses, including rebuttal witnesses, expected to be called to testify by plaintiff, except those who may be called for impeachment purposes as defined in NECivR 16.2(c) only, are:

Marvin Dufner (Live)
 8 Rauscher Drive
 St. Louis, MO 63124

Raymond Kohout (Deposition)
 15 Spring Green Court
 Lake Ozark, MO 65049

Raymond Reynolds (Deposition)
 1283 Somerset Field Drive
 Chesterfield, MO 63005

Yijun Carrie Zhou (via Zoom link)
 Aprio
 5 Concourse Parkway, Suite 1000
 Atlanta, GA 30328

All witnesses expected to be called to testify by defendant, except those who may be called for impeachment purposes as defined in NECivR 16.2(c) only, are:

Lenoir Zaiser, IV (Deposition)
    Azimuth Technology, LLC
    10130 Market Street, Ste. 7
    Naples, FL  34112

Matthew Taschner (Deposition)
    5516 91st Crescent North
    Brooklyn Park, MN  55443

William Kenedy (Live)
    Lutz & Co., P.C.
    13616 California Street
    Suite 300
    Omaha, Nebraska 68154

It is understood that, except upon a showing of good cause, no witness whose name and address does not appear herein shall be permitted to testify over objection for any purpose except impeachment. A witness who has been identified as offering testimony solely to establish foundation for an exhibit shall not be permitted to testify for any other purpose, over objection, unless such witness has been disclosed pursuant to Federal Rule of Civil Procedure 26(a)(3). A witness appearing on any party's witness list may be called by any other party.

The parties stipulate and agree that they do not object to the appearance of witnesses by deposition or remotely by Zoom link.

(E)    Expert Witnesses' Qualifications. Experts to be called by plaintiff and their qualifications are:

Yijun Carrie Zhou (via Zoom link)—The *curriculum vitae* of Ms. Zhou is attached hereto.

Experts to be called by defendant and their qualifications are:

William Kenedy (live)—The *curriculum vitae* of Mr. Kenedy is attached hereto.

Matthew Taschner—Mr. Taschner is listed above as a fact witness, but to the extent his testimony comes within the scope of Federal Rule of Evidence 702, his qualifications to offer such testimony are set forth herein. Mr. Taschner is an industry-leading professional in the firearm wholesale industry. He has worked in purchasing for Bill Hicks & Co., Ltd. for 26 years and is currently its merchandise manager and senior purchasing agent. Bill Hicks is a wholesaler of firearms that ranks in the top five of any brand firearm for wholesale distribution. While at Bill Hicks, Mr. Taschner has purchased from gun manufacturers and sold to gun distributors or retailers millions of firearms, including rifles, shotguns, handguns, and every other form of firearm available in the United States except for Class III weapons, which are fully automatic weapons. Prior to working at Bill Hicks & Co. Mr. Taschner worked for nine and a half years in firearm retail.

The parties stipulate and agree that they do not object to the appearance of witnesses by deposition or remotely by Zoom link.[2]

(F) Voir Dire. Counsel have reviewed Federal Rule of Civil Procedure 47(a) and NECivR 47.2(a) and suggest the following with regard to the conduct of juror examination:

Not applicable.

(G) Number of Jurors. Counsel have reviewed Federal Rule of Civil Procedure 48 and NECivR 48.1 and suggest that this matter be tried to a jury composed of \_\_\_\_\_ members.

---

[2] As to expert reports:

--The parties intend to use the expert reports as demonstrative exhibits only; and

--The supplemental report of Yijun Carrie Zhou, and the opinions within it, have been stricken by court order. See Filing No. 121, dated August 17, 2021.

Not applicable.

(H) Verdict. The parties [will] [will not] stipulate to a less-than-unanimous verdict. (If applicable), the parties' stipulation is: _____.
Not applicable.

(I) Briefs, Instructions, and Proposed Findings. Counsel have reviewed NECivR 39.2(a), 51.1(a), and 52.1, and suggest the following schedule for filing trial briefs, proposed jury instructions, and proposed findings of fact, as applicable:

By October 1, the parties will:
- List their respective objections to exhibits in the Exhibit List.
- Submit their respective deposition designations.

By October 4, 2021, the parties will:
- Submit their objections to the other party's deposition designations.
- Submit their respective deposition counterdesignations.

By October 5, the parties will:
- File their trial briefs.
- File their proposed findings of fact.
- Submit their objections to the other party's deposition counterdesginations.
- File their motions in limine.

(J) Length of Trial. Counsel estimate the length of trial will consume not less than 2 days, not more than 3 days, and probably about 2 days.

(K) Trial Date. Trial is set for October 12, 2021.

15

By: s/Robert J. Kaufman
Robert J. Kaufman
Eric M. Underriner
HALL BOOTH SMITH, P.C.
191 Peachtree Street, Suite 2900
Atlanta, Georgia 30350
(404) 954-5000
rkaufman@hallboothsmith.com
eunderriner@hallboothsmith.com
*Counsel for Plaintiff DoubleTap Defense, LLC*

By: s/ Andre R. Barry
Andre R. Barry, #22505
Nathan D. Clark, #25857
CLINE WILLIAMS WRIGHT
   JOHNSON & OLDFATHER, L.L.P.
233 South 13th Street
1900 U.S. Bank Building
Lincoln, Nebraska 68508
abarry@clinewilliams.com
nclark@clinewilliams.com
*Counsel for Defendant Hornady Manufacturing, Co.*

BY THE COURT:

Hon. Cheryl Zwart, Magistrate Judge