IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| DOUBLETAP DEFENSE, LLC, | |
| Plaintiff, | **8:18CV492** |
| vs. | |
| HORNADY MANUFACTURING CO., | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| Defendant. | |

The matter came on for trial to the Court on October 12 and 13, 2021.  Having considered the evidence, the parties' arguments, and post-trial motions, the Court now makes the following Findings of Fact and Conclusions of Law in accordance with Federal Rule of Civil Procedure 52.

## FINDINGS OF FACT[1]

**Parties and Jurisdiction**

1.     Plaintiff DoubleTap Defense, LLC ("DTD") is a limited liability company organized under the laws of Georgia.  Its only member is a citizen of Missouri.  Filing No. 124 at 2, ¶ 1, Order on Final Pretrial Conference.  DTD was formed as Heizer Technologies, LLC in or about late 2010 or 2011 by Marvin Dufner and Ray Kohout and later renamed as DoubleTap Defense, LL. *Id.* at ¶ 5.

2.     Hornady is a corporation organized under the laws of Nebraska, with its principal place of business is in Grand Island, Nebraska.  *Id.* at ¶ 2.  Hornady is a manufacturer of ammunition for sportsmen, law enforcement, and military professionals. The Court has jurisdiction over Hornady because it is a citizen of the State of Nebraska with its principal place of business located within the District of Nebraska.  *Id.* at ¶ 6.

---

[1] The Court incorporates the parties' list of uncontroverted facts as stated in the Court's Order on Final Pretrial Conference, Filing No. 124 at 2-10, though not all facts are repeated here.

3.     The amount in controversy in this dispute, exclusive of interest and costs, exceeds seventy-five thousand dollars.  *Id.* at ¶ 3.  Hornady conducts business within the geographical boundaries of this district, and a substantial part of the events or omissions giving rise to DTD's claims occurred in this district.  *Id.* at ¶ 4.

**The Trademark and License Agreement**

4.     On December 22, 2010, Central Holding Corporation filed a trademark application with the USPTO under Serial No. 85-204480 seeking registration of the trademark "DOUBLETAP" in connection with firearms— specifically, "pistols". Filing No. 124 ¶ 7.

5.     On June 11, 2012, CHC assigned the Application in the mark to Heizer Technologies, LLC. At and before the 2012 SHOT Show, a national firearms tradeshow, DTD used the DOUBLETAP trademark to promote the forthcoming DoubleTap Tactical Pocket Pistol (the "Pocket Pistol") it intended to manufacture and sell.  *Id.* at ¶ 8.

6.     Some of Hornady's ammunition products bear its registered TAP mark, under which Hornady has sold various products since 1997.  To protect its TAP mark, Hornady has sued two unrelated entities—DTD and Double Tap Ammunition, Inc. ("DTA")—for trademark infringement.  *Id.* at 3, ¶ 11, Page ID # 1314.  Hornady sued DTA on January 5, 2011, *see Hornady Manufacturing Company, Inc. v. Double Tap Ammunition, Inc.*, No. 2:11-cv-00018-TS (D. Utah), and sued DTD on or about June 11, 2012, *see Hornady Manufacturing Company v. Heizer Firearms, LLC, et al.*, No. 4:12-cv-3117-WKU-CRZ (D. Neb.).  Filing No. 124 ¶ 12.

7.     Hornady and DTD resolved their dispute in the District Court of Nebraska through execution of a Trademark Assignment and License Agreement (the "Agreement"), effective March 13, 2013.  *Id.* at ¶ 13.

8.     Under the terms of the Agreement, DTD agreed to assign to Hornady all right, title and interest in the DOUBLETAP Marks, to cause all other parties claiming an interest in the DOUBLETAP Marks to assign all such interest to Hornady, to abandon its registration application, and to pay Hornady a $25,000 license fee. *Id.* at ¶ 14.

9.     The Agreement also contained an indemnification provision, the meaning of which the parties dispute, and was central to the issues at trial. *Id.* at 3–4, ¶ 15.

10.     Paragraph 10 of the Agreement required DTD to promptly notify Hornady of any and all infringements, imitations, simulations or other illegal use or misuse of the "Marks," as that term was defined in the Agreement and Hornady was required to determine whether to take any action to prevent such use or misuse. *Id.* at ¶ 16.

11.     Following execution of the Agreement, DTD alerted Hornady to the existence of at least three other businesses using the DOUBLETAP Mark and requested that Hornady, pursuant to the terms of the Agreement, address these activities. *Id.* at ¶ 17.

12.     On or about March 7, 2013, Hornady transmitted cease-and-desist letters to companies which DTD informed Hornady were using the DOUBLETAP Mark. *Id.* at ¶ 18.

13.     DTD abandoned its registration of the Mark in March 2013. *Id.* at 4, ¶ 19.

14.     Hornady continued to litigate with DTA regarding the DOUBLETAP Mark. The U.S. District Court for the District of Utah and the U.S. Court of Appeals for the Tenth Circuit ultimately held that DTA's unregistered mark did not infringe on Hornady's TAP mark. *Id.* at 4–5, ¶ 20.

**DTD's Pocket Pistol**

15.     DTD was formed to produce Kohout's concept of a Derringer-style, two-

barrel concealable firearm that would fire single shots out of each barrel through successive "double tap" trigger pulls.  *Id.* at 5, ¶ 21.  Kohout had experience in the firearm sales industry.  He did not have a formal education in engineering or firearm design.  *Id.* at ¶ 22.

16.    DTD promoted the Pocket Pistol as being available in either .45 ACP or 9 mm, and in either a titanium or aluminum frame.  *Id.* at ¶ 23.  The Pocket Pistol carried two rounds and housed two additional rounds in its integral grips.  *Id.* at ¶ 24.  Kohout patented his idea for the trigger mechanism of the Pocket Pistol and that patent was assigned to DTD.  *Id.* at ¶ 27.

17.    While Kohout had knowledge about designing firearms, Dufner did not. Dufner's role at DTD was to provide capital and contribute his experience in running businesses.  *Id.* at ¶ 25.  DTD was capitalized by Dufner either directly through personal loans, or by bank loans he personally guaranteed.  *Id.* at ¶ 26.

18.    DTD initially intended to have the Pocket Pistol manufactured by Heizer Defense, LLC, but that relationship ended before production began.  *Id.* at ¶ 28.

19.    Heizer Defense, and associated companies and individuals, were party to a dispute with DTD concerning intellectual property rights in the Pocket Pistol, which ended with a settlement agreement in which Charles Heizer was added as a co-inventor to DTD's utility patent.  *Id.* at ¶ 29.

20.    DTD partnered with Azimuth Technology to produce the Pocket Pistol. Pursuant to this agreement, Azimuth would manufacture the Pocket Pistols and DTD would purchase them from Azimuth, as needed, at approximately $170 per unit for resale to distributors.  *Id.* at 5–6, ¶ 30.

21.    In total, Azimuth manufactured 23,000 to 25,000 Pocket Pistols under a

single purchase order from DTD for 25,000 aluminum-frame Pocket Pistols.  *Id.* at 6, ¶ 31.

22.     As DTD and Azimuth developed the Pocket Pistol, they became aware that the Pocket Pistol had the potential to "double strike," meaning the pistol would fire both barrels simultaneously in response to one trigger pull.  *Id.* at ¶ 32.

23.     DTD began shipping Pocket Pistols for retail sale in or about late May or early June 2013.  *Id.* at ¶ 33.

24.     Although the price for a Pocket Pistol ranged depending on the model and features, DTD sold the Pocket Pistol to distributors on average for approximately $400.  *Id.* at ¶ 34.

25.     Soon after the Pocket Pistol's launch, DTD began to receive customer complaints of double strikes, which continued into August 2013 despite an attempted adjustment to the firing spring.  *Id.* at ¶ 35.

26.     By October 2013, DTD and Azimuth had been in discussions about the complaints of double strikes.  DTD decided to temporarily suspend shipping until the cause of the problem was identified and a solution implemented.  *Id.* at ¶ 36.  As late as December 2013, DTD was considering a recall and engaging in plans to replace components of Pocket Pistols that had already shipped.  DTD opted not to do a recall.  *Id.* at ¶ 37.

27.     By April 2014, DTD was seeking to sell its remaining inventory of its original Pocket Pistol, referred to by DTD as the "Gen 1" design, and did not intend to produce pistols with that same design any longer.  *Id.* at ¶ 39.

28.     DTD entered into an agreement with Azimuth in which 6,000 of the 8,300 remaining inventory guns would be sold to Bill Hicks & Co., Ltd., a leading national

wholesale distributor of firearms.  *Id.* at ¶ 40.

29.    The DTD-Azimuth agreement provided that DTD would sell 6,000 pistols to Bill Hicks for $200.00 per Pocket Pistol, and that it would pay Azimuth $50.00 per Pocket Pistol plus $5.00 in consideration of excise tax.  *Id.* at ¶ 41.

30.    The sale to Bill Hicks was negotiated in April 2014, and Bill Hicks ultimately purchased about 4,500 guns, which were ordered and shipped in May 2014.  *Id.* at ¶ 42.

31.    The remaining guns after the Bill Hicks sale were largely sold to Chattanooga Shooting Supply directly by Azimuth, and at this time, DTD has virtually no inventory of Pocket Pistols remaining.  *Id.* at ¶ 43.

32.    The Bill Hicks sale with DTD was handled by Bill Hicks's Merchandise Manager and Senior Purchasing Agent, Matthew Taschner.  *Id.* at ¶ 44.

33.    Taschner purchased the Pocket Pistols with the intention of selling them to retailers at approximately $250 per piece, but after selling some at that price initially, was only able to sell the balance at $150.  *Id.* at ¶ 45.

34.    Taschner testified that the price-competitive nature of the firearms industry would prevent DTD from selling another firearm similar to the original Pocket Pistol for its original price and it is highly unlikely that DTD could sell such a firearm above the closeout price of $150.  This would be true of a polymer version of the original Pocket Pistol, as well other similar firearms.  Ex. 159 at 30:16–34:12, 34:18–35:11, 62:5–65:2.

35.    Taschner testified that wholesalers in the firearms industry typically earn a margin of 10%.  Ex. 159 at 37:8–12.  At a sale price of $150 and margin of 10%, (Ex. 159 at 36:10–37:20), a wholesaler (such as Bill Hicks & Co.) would not be expected to pay more than about $135 per firearm, which was less than the price per gun it cost DTD to purchase the Pocket Pistol from Azimuth.

6

36.     As early as mid-2013, DTD considered manufacturing a second-generation model of its Pocket Pistol, which was referred to by DTD as the "Gen 2". Filing No. 124 ¶ 46.  DTD was considering manufacturing the Gen 2 models in at least three versions: aluminum, titanium, and polymer.  *Id.* at ¶ 47.

37.     DTD communicated with Azimuth in November 2013 regarding the metal-frame versions of the Gen 2, and discussed potential changes, including a redesigned the trigger mechanism.  *Id.* at ¶ 48.  Kohout did not recall if those discussions with Azimuth progressed beyond November 2013, and he did not recall if he ever received CAD drawings for the metal-frame Gen 2 from Azimuth.  *Id.* at ¶ 49.

38.     Len Zaiser, Azimuth's chief managing partner, testified that as of June 9, 2014, the parties were not in any talks concerning a future manufacturing arrangement. Ex. 157 at 97:17–101:19.  Dufner's testimony confirmed Zaiser's testimony.  Ex. 158 at 117:9–18.

39.     In November 2013, Ray Kohout met, and otherwise communicated, with Paul Reed of Nordon Inc.  They discussed the following issues regarding the manufacture of a polymer frame Pocket Pistol: a) approximate unit cost, b) mold development and manufacturing cost, c) approximate time frames for production, and d) production runs. Filing No. 124 ¶ 50.  In November 2013, Mr. Kohout also met with Tom Pierce, an engineer.  *Id.* at ¶ 51.

40.     DTD did not ever produce a prototype of the Gen 2 in either a polymer or metal frame.  *Id.* at ¶ 52.  Dufner confirmed that there is no viable Gen 2 prototype: "You can't study something you don't know what you're studying. We didn't have a final version. We were in the preliminary stages."  Ex. 158 at 118:19–21.

**DTA's Cease-and-Desist Letter**

41.     On or about June 9, 2014, DTA sent a cease-and-desist letter to DTD alleging that DTD's use of DOUBLETAP Mark infringed on DTA's unregistered mark. Filing No. 124 ¶ 53.

42.     On or about June 13, 2014, DTD provided the DTA cease-and desist letter to Hornady.  *Id.* at ¶ 54.  DTD asserted that under Section 7 of the Agreement, Hornady had a duty to indemnify DTD against liability for claims of trademark infringement.  *Id.* at ¶ 54.

43.     On June 20, 2014, counsel for Hornady wrote to counsel for DTD stating Hornady's belief that it had no indemnity obligation in connection with DTA's claim and that DTD would be responsible to defend itself.  *Id.* at ¶ 56.

44.     DTA never filed a complaint against DTD alleging trademark infringement, or any other claim relating to DTD's use of the Marks as defined in the Agreement or initiated any other type of legal action against DTD.  *Id.* at ¶ 57.  No judgment, or any other form of enforceable legal obligation, has been entered against or imposed upon DTD and in favor of DTA on the basis of any claim for trademark infringement, or any other claim relating to DTD's use of the Marks as defined in the Agreement.  *Id.* at ¶ 58.

45.     DTD has not paid any sum to DTA, in settlement of any asserted claims or demands or for any other reason, in connection with DTA's June 9, 2014, cease-and-desist letter.[2]  *Id.* at ¶ 59.

46.     On June 7, 2018, DTD filed a Complaint alleging Hornady breached the Agreement and filed a First Amended Complaint on June 8, 2018.  *Id.* at 10 ¶ 58.

---

[2] In its post-trial briefing, DTD has not separately requested as damages attorneys' fees related to responding to the cease-and-desist letter. Accordingly, the Court has limited its review and findings to the damages sought in DTD's post-trial briefing.

**CONCLUSIONS OF LAW**

The parties appear to agree that there are three issues for the Court to decide: (1) Whether Hornady breached its indemnity obligation to DTD; (2) if so, whether the breach caused damages; and (3) if so, whether DTD proved those damages with reasonable certainty. Filing No. 145 at 24:21-25:6; Filing No. 147 at 4. Having reviewed the evidence, the Court makes the following conclusions of law:

1. **Breach of Agreement Claim**

    ***A. Scope of DTD's Breach of Contract Claim***

    To determine whether Hornady breached the parties' Agreement, the Court must first determine the appropriate scope of DTD's claim. The parties do not dispute that DTD's claims are governed by Section 7 of the Agreement—the indemnification section. In its entirety, Section 7 states:

> SECTION 7. INDEMNIFICATION. EACH PARTY SHALL INDEMNIFY, DEFEND, PROTECT, AND HOLD HARMLESS THE OTHER PARTY AND ITS OFFICERS, DIRECTORS, OWNERS, MEMBERS AND EMPLOYEES FROM AND AGAINST ALL CLAIMS, DEMANDS, LAWSUITS, DAMAGES, LIABILITIES, JUDGMENTS, COSTS, AND EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES) ARISING FROM OR RELATING TO A PARTY'S BREACH OF THIS AGREEMENT; OPERATION OF ITS BUSINESS, ITS DESIGN, MANUFACTURE, SALE OR DISTRIBUTION OF ANY PRODUCT AND/OR SERVICES, THE ACT OF ANY EMPLOYEE, AGENT, OR PRINCIPAL CONNECTED WITH ITS BUSINESS; ITS OBLIGATIONS UNDER THIS AGREEMENT; ANY LIABILITY RESULTING FROM THE USE OR MISUSE OF ANY PRODUCT AND/OR SERVICES BY ANY END USER OF SUCH PRODUCT AND/OR SERVICES; OR, WITH RESPECT TO LICENSEE, LIABILITY RELATED TO TRADEMARK INFRINGEMENT CLAIMS FOR ITS USE OF THE MARKS AS CONTEMPLATED BY THIS AGREEMENT. THE INDEMNIFIED PARTY SHALL RETAIN THE RIGHT TO SELECT ITS COUNSEL IN THE EVENT THE INDEMNIFIED PARTY IS THREATENED WITH OR JOINED IN ANY ACTION ARISING FROM THE INDEMNIFYING PARTY'S ACTIONS OR INACTION.

Filing No. 2-1 at 4.

DTD argues that it can show breach based on any provision within Section 7. Hornady argues that the scope of DTD's claim cannot be so broad because at every stage of litigation, DTD has asserted only that Hornady breached its obligation to indemnify against liability related to trademark infringement claims. The language of DTD's demands and allegations are instructive here. DTD's assertions began on or about June 13, 2014, when it transmitted the cease-and desist letter to Hornady and made its demand.  Filing No. 124, Parties' Stipulated Facts ¶ 54.  Quoting from specific language in Section 7, counsel for DTD stated:

> Pursuant to Section 7 of the Agreement, Hornady has a responsibility to "indemnify(,) defend, protect, and hold harmless the other party . . . from and against all claims, demands, lawsuits, damages, liabilities, judgments, costs and expenses (including reasonable attorneys' fees) arising from or relating to . . . with respect to the licensee, liability **related to trademark infringement claims for its use of the marks as contemplated by (the) Agreement**."

*Id.* (emphasis added).

In the operative complaint, DTD described the language Hornady breached using the following allegation:

> In exchange for the foregoing, Hornady Mfg. also agreed to indemnify and hold harmless DTD, the licensee:
>
> FROM AND AGAINST ALL CLAIMS, DEMANDS, LAWSUITS, DAMAGES, LIABILITIES, JUDGMENTS, COSTS, AND EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES) **ARISING FROM OR RELATING TO . . . LIABILITY RELATED TO TRADEMARK INFRINGEMENT CLAIMS FOR [DTD's] USE OF THE MARKS AS CONTEMPLATED BY THIS AGREEMENT.**
>
> Exhibit 1 at § 7.

Filing No. 45. at 5, ¶ 17, Second Am. Comp. (emphasis added; ellipses in original).  DTD inserted the ellipsis in the above quote, omitting all grounds for indemnification other than

liability related to trademark infringement.  DTD made the same allegation in its original and first amended complaints.  Filing Nos. 1 & 2.

DTD relied on the same limited language of Section 7 throughout the course of litigation.  For example, in support of its motion for partial summary judgment, DTD asserted that "Hornady expressly agreed to indemnify, defend, protect, and hold harmless DTD from all claims, demands, and/or lawsuits with respect to licensee DTD's **liability related to trademark infringement claims for its use of the marks**."  Filing No. 94-1 at 6–7, DTD's Br. in Supp. of Mot. for Partial Summ. J., (emphasis added).  DTD asserted that when it asked Hornady to honor its obligation in response to the cease-and-desist letter, Hornady refused.  *See id.*

In sum, at all times relevant to this litigation, DTD has consistently asserted that Hornady breached its obligation to indemnify DTD for liability related to trademark infringement claims.  At no point before the Final Pretrial Order did DTD assert any other theory of breach.  Thus, the scope of DTD's breach of contract claim must be limited to whether Hornady breached its duty to indemnify for liability related to trademark infringement claims.

### B. Business Operations Theory and Motion to Amend

In preparation of the Final Pretrial Order, DTD asserted that its claim for breach was not limited to indemnification for trademark infringement liability.  Specifically, in the Final Pretrial Order, DTD asserted that the scope of the breach issue should be: "Whether Hornady's failure to indemnify and/or protect DTD from liability, damages, or claims arising from, inter alia, 'the operation of its business' in accordance with Section 7 of the Agreement is a breach."  Filing No. 124 at 10.  This was the first time in this litigation that DTD raised a "business operations" theory of breach.

DTD, nevertheless, argues that its "business operations theory" was validly before the Court at trial because it was included in the Final Pretrial Order. However, its inclusion in the Final Pretrial Order is not dispositive.  The Order specifically noted that the scope of DTD's breach was a subject of "ongoing debate."  *Id.* at 10 n.1.  Moreover, while Hornady was likely aware, beginning with the Final Pretrial Order, that DTD was attempting to assert a business operations theory of breach, Hornady opposed inclusion of the business operations theory and the Court never indicated that it would amend the pleadings or issues to include such a theory.

DTD also argues that Hornady failed to object to evidence adduced at trial related to a business operations theory, thereby waiving any objection to the theory being tried. DTD does not directly state what evidence this was or offer a citation to the trial transcript. The Court's review of the record does not reveal any evidence at trial expressly directed toward a business-operations liability theory and there could not have been any evidence on this theory in the deposition testimony offered by DTD because the theory was not raised until the Final Pretrial Order.

DTD attempts to save its business operations theory by moving to amend its pleadings to conform to the evidence. However, as noted above, DTD does not identify which evidence adduced at trial supports its theory.  Federal Rule of Civil Procedure 15(b)(2) allows a party's pleadings to be amended to conform with the evidence only if "an issue not raised by the pleadings is tried by the parties' expressed or implied consent." *See also Trip Mate, Inc. v. Stonebridge Cas. Ins. Co.*, 768 F.3d 779, 784–85 (8th Cir. 2014) (consent to amend pleadings at trial is implied only where the non-moving party, had actual notice of the implied amendment claim and an adequate opportunity to cure any surprise).

12

Although Hornady was aware of DTD's attempt to include the business operations theory, DTD did not express a direct intention to move for amendment, nor did the Court expressly indicate that it would consider such a theory.  Accordingly, the motion to amend will be denied and DTD will be limited to the theory of breach it has asserted since before the inception of this litigation.  DTD's claims are limited to whether Hornady breached the portion related to "liability related to trademark infringement claims."

### C.  Indemnification for Liability for Trademark Infringement

DTD has not shown that Hornady breached its obligation to indemnify against liability for trademark infringement claims.   "It is an elementary rule of construction that effect must be given, if possible, to every word, clause, and sentence." *Kraski v. Banwell*, 263 N.W.2d 458, 460, *supplemented*, 265 N.W.2d 458 (Neb. 1978); *see also Timberlake v. Douglas Cty.*, 865 N.W.2d 788, 797 (Neb. 2015) ("[W]e have applied the principle of expression unius est exclusio alterius (the expression of one thing is the exclusion of the others), when interpreting both statutes and contracts."). Because the applicable language of the Agreement is limited to "liability" with respect to claims of trademark infringement, in order to trigger an indemnity obligation with regard to trademark infringement claims, there must actually be liability from DTD to some other party.  The Court previously recognized that the plain language of Section 7 required Hornady to indemnify for trademark infringement claims but that "the duty to indemnify for trademark infringement arises only when liability attaches." Filing No. 121 at 26, Memorandum and Order.  The only issue remaining for trial was whether liability attached.  *Id.* at 26-27.

The parties stipulated in the Final Pretrial Order that DTA never filed a complaint against DTD alleging trademark infringement, or any other claim, relating to DTD's use of the Marks as defined in the Agreement, nor did DTA initiate any other type of legal action

against DTD.  Filing No. 124 ¶ 57.  Consequently, there was no judgment or any other form of enforceable legal obligation imposed against DTD and in favor of DTA on the basis of any claim for trademark infringement or any other claim relating to DTD's use of the Marks as defined in the Agreement.  *Id.* at ¶ 58.  The parties also agreed that DTD has not paid any sum to DTA representing settlement of any asserted claims or demands or for any other reason in connection with DTA's June 9, 2014, cease-and-desist letter. *Id.* at ¶ 59.  DTA's cease-and-desist letter did not seek damages from DTD.  Tr. Ex. 15 at 37–38.  While DTD continued to attempt to sell some products at the time it received the cease-and-desist letter, there is no evidence in the record that the letter had any effect on those efforts by DTD.  Filing No. 145 at 191:22–193:12; Tr. Ex. 139.  Thus, there is no evidence that liability for trademark infringement attached and Hornady could not have breached the Agreement.

## 2.   Causation

Even if Hornady somehow breached the Agreement in its refusal to indemnify, the evidence does not show that such a breach caused damage to DTD.  "In any damage action for breach of contract, the claimant must prove that the breach of contract was the proximate cause of the damages. This requires a causal relationship between the damages asserted and the breach relied upon."  *Union Ins. Co. v. Land & Sky, Inc.*, 568 N.W.2d 908, 911 (Neb. 1997). "A defendant's conduct is a proximate cause of an event if the event would not have occurred but for that conduct, but it is not a proximate cause if the event would have occurred without that conduct." *Worth v. Kolbeck*, 728 N.W.2d 282, 290 (Neb. 2007).

The evidence does not show that DTD's losses would only have occurred because of Hornady's breach.  DTD claimed initially that it was continuing to sell guns at the time

of the June 9, 2014, cease-and-desist letter and that Hornady's refusal to indemnify DTD left DTD with 10,000 units of product that it was forced to sell at a discount of 25 cents on the dollar.  Tr. Ex. 147.  However, later discovery revealed that in April 2014, DTD was seeking to sell its remaining inventory of its original Pocket Pistol—which DTD refers to as its "Gen 1" design, and that it did not intend to produce pistols of that same design any longer.  Filing No. 124 at 7 ¶ 39.

Evidence at trial showed that DTD's losses were related to problems with the Gen 1 pistol, and not the result of Hornady's refusal to indemnify.  Dufner testified that there were "reportedly" problems with misfires and double fires in guns that were sold to the public.  Filing No. 145 at 119:10–120:12. Moreover, in emails exchanged between DTD and Azimuth on September 25 and 26 of 2013, there were discussions concerning the importance of changing the design of the gun to eliminate misfires and double fires.  *Id.* at 122:8–124:10; Tr. Ex. 105, Tr. Ex. 106.  In an email, Kohout stated that everyone involved agreed the design of the firing mechanism needed to be changed, that "this cannot be a Band-Aid fix and must eliminate the witness mark 100 percent even when firing +p ammo."  *Id.* at 125:7–24; Tr. Ex. 105.

Although Dufner's testimony at trial downplayed problems with the pistols, an email he sent to Azimuth September 26, 2013, indicates that Dufner was concerned about the potential for double fires in Pocket Pistols already sold by. His email stated, "Unfortunately, the double strike issue has surfaced once again. And now there are many more guns on the market to consider."  *Id.* at 130:20 – 23; Tr. Ex. 106.  The email also stated that Dufner and Kohout were "dealing with phone calls daily and letters from attorneys."  Tr. Ex. 106.  While Dufner claimed this was an "exaggeration" made "in an effort to get Azimuth's attention," (Filing No. 145 at 131:2–20), Dufner admitted that at

that point in time, a decision was made to suspend shipping until a solution could be found, and that shipping was actually suspended for a period of approximately two weeks. *Id.* at 131:21–133:22.

After DTD suspended shipments in September 2013, it never generated a monthly profit.  DTD's earning in its first twelve months of selling the Pocket Pistol is set out in the below table, with losses designated by parentheses:

| Month | Sales Revenue | Gross Profit | Net Income |
|---|---|---|---|
| May 2013 | $130,317 | $54,311 | **$(23,950)** |
| June 2013 | $736,004 | $322,355 | **$245,718** |
| July 2013 | $1,493,327 | $689,957 | **$605,444** |
| August 2013 | $1,481,248 | $482,862 | **$473,350** |
| September 2013 | $1,118,994 | $40,173 | **$336,580** |
| October 2013 | $81,771 | $40,173 | **$(85,482)** |
| November 2013 | $90,662 | $22,605 | **$(139,130)** |
| December 2013 | $119,307 | $49,394 | **$(17,431)** |
| January 2014 | $26,849 | $1,850 | **$(174,999)** |
| February 2014 | $20,370 | $(14,701) | **$(93,541)** |
| March 2014 | $60,767 | $16,385 | **$(41,890)** |
| April 2014 | $6,880 | $8,860 | **$(72,578)** |

Filing No. 124 at ¶ 38, Final Pretrial Order, Stipulations.  The evidence shows that DTD's losses were more directly related to its decision to stop shipping on Gen 1 pistols in September 2013 rather than the cease-and-desist letter in June 2014.

DTD claims that but for Hornady's breach, it could have marketed its Gen 2 pistol to remain a viable entity.  However, there is no evidence that DTD had any serious ability to manufacture and market the Gen 2 pistol.  DTD admitted that it never had even a prototype of a second-generation polymer Pocket Pistol. Tr. Ex. 26 at 132:14–20.  Kohout testified that the only plan he had seen for a second- generation gun, in November of 2013, was "overruled quickly by him" and that he sent Azimuth "back to the drawing board," and that he could not recall any progress on a second-generation metal gun after November of 2013.  Tr. Ex. 26 at 97:10–100:6.  Dufner also testified he could not recall

any designs for a second-generation polymer gun that was produced after 2013: "I don't remember when I saw them or what I saw. That wasn't my part of the business." Filing No. 145 at 174:14–22.  Without a prototype that could be tested or any prospect of a manufacturer (*see id.* at 269:15–270:3), DTD could not know whether it had a viable product (Tr. Ex. 26 at 132:21–133:8) much less claim that its inability to produce a second-generation pistol was the result of Hornady's refusal to indemnify.  Accordingly, the Court is not convinced that DTD adequately proved causation.

### 3.      Damages With Reasonable Certainty

Even if DTD somehow demonstrated breach and causation, DTD has not adequately proved damages.  Under Nebraska law, a "claimant of damages must furnish appropriate data to enable the trier of fact to find such damages with reasonable certainty without resorting to conjecture or speculation." *Summit Restoration, Inc. v. Keller*, 953 N.W.2d 816, 830 (Neb. 2020), *review denied* (Mar. 8, 2021).  The Nebraska Supreme Court has "explained that, in many instances, lost profits from a new business are too speculative and conjectural to permit recovery of damages." *Bedore v. Ranch Oil Co.*, 580, 805 N.W.2d 68, 88 (Neb. 2011); *see also Mostly Media, Inc. v. U.S. West Comms.*, 186 F.3d 864, 867 (8th Cir. 1999) ("The burden of proof required of a plaintiff in a lost profits case is admittedly heavy.")

DTD did not offer any evidence as to the value of that mark.  Filing No. 146 at 265:16–23.  As pled, DTD's theory of damages is that Hornady's refusal of DTD's demands allegedly caused its business operations to cease and, consequently, Hornady should pay the entirety of DTD's proffered value of its business. Accordingly, DTD's expert, Carrie Zhou, was asked to estimate the entire value of DTD's business. *Id.* at 222:1–11.  Zhou testified that she valued DTD based upon an income approach—and

17

specifically the discounted cash flow method—which she applied by estimating future sales of the first-generation pocket pistol that was discontinued prior to the June 9, 2014, cease-and-desist letter. *Id.* at 231:10–16. Zhou testified that it was her opinion that the fair value of the equity of DTD as of June 9, 2014, was $4.07 million. *Id.* at 258:24–259:2.

The Court finds Zhou's testimony unconvincing for several reasons. First, Zhou based her valuation of the company on projected sales of the first-generation pocket pistol. Zhou admitted that she arrived at her valuation on this basis. *Id.* at 282:8–15. She also admitted that her valuation was not based upon projected sales of a second-generation polymer gun. *Id.* at 282:16–19. Zhou stated that she believed her original projection of sales of the first-generation pistol could apply to a second-generation metal gun. *Id.* at 282:20– 283:11. However, she conceded that for her estimate to be valid, she needed to be able to assume that there would be a metal gun to manufacture, and that the financial metrics for the gun, i.e., the cost of the gun to DTD and the price DTD could sell it for, would be approximately the same as the Gen 1 aluminum gun. *Id.* Zhou conceded that if those numbers changed, she would need to rework the valuation in her report. *Id.* at 283:12–14.

The evidence demonstrates that DTD could not show that it would be able to manufacture or market a second-generation pistol, let alone project that it would be sold at the same price and volume of the first-generation pistol. As noted above, the redesign for the second-generation pistol never got past preliminary discussions and Kohout could not recall whether any progress on a second-generation mode of the metal gun was made after November of 2013. Tr. Ex. 26 at 97:10–100:6. Moreover, Zhou testified that she relied on Dufner in assuming that the profitability of a second-generation metal gun would be similar to profitability of the first-generation gun. Filing No. 146 at 286:6–23. There

18

was little, if any, evidence to support the assumption that a second-generation metal pistol would be able to be sold at the same price and generate the same profitability as the first-generation pistol.

Courts have held that lost-profits estimations based solely on existing business are speculative and conjectural unless the estimation accounts for potential differences. For example, in *Katskee v. Nevada Bob's Golf of Nebraska*, 472 N.W.2d 372 (Neb. 1991), the Nebraska Supreme Court reviewed an expert's testimony on damages from the breach of a lease. Nevada Bob's claimed Katskee breached a right of first refusal to lease a space adjoining the demised premises, forcing Nevada Bob's to relocate to a larger space where it could expand its business. *Id.* at 375–76. The court rejected Nevada Bob's expert's assumption that the per-square-foot revenue of the new location could be applied to lost profits in the old location because the assumption was speculative and conjectural. *Id.* at 379–80. The court explained that "[n]o studies or comparisons were made as to differences in the customer base, relative accessibility of the facilities, proximity to recreation areas or other shopping areas, parking, or any other external factors." *Id.* at 380. Further, the expert—

> used sales figures from a different time period and made no study as to any changes in the relevant market. He did not evaluate whether there was any change in the number of competitors, whether there was any change in the consumer interest in the relevant products, or whether there were any changes in the products sold by Nevada Bob's.

*Id.*

For similar reasons, DTD's damages estimate fails to take into account any differences between the first-generation pocket pistol and a conceivable second-generation pocket pistol. Zhou's estimation did not include any consideration of differences in the markets or materials that would be used in the second-generation pistol.

19

Zhou's estimate had to essentially rely on the assumption that DTD would continue to sell the first-generation pistol even though there were no plans to sell the first-generation pocket pistol after the sale to Bill Hicks & Co., which took place prior to June 9, 2014. Filing No. 145 at 161:16–18.  In the alternative, Zhou had to rely on the assumption that DTD would produce an equally profitable second-generation pistol even though no viable second-generation pistol was in the works. Dufner could not recall any designs for a second-generation polymer gun that was produced after 2013.  *Id.* at 174:14–22.  Kohout testified that there was never a metal prototype of a second-generation pistol that could be test-fired (*Id.* at 117:3–17) nor was a second-generation pistol ever manufactured for sale to the public.  Tr. Ex. 26 at 117:18–21; Tr. Ex. 26 at 132:14–20.  In fact, after sale of its inventory and parting ways with Azimuth in May of 2014, DTD had no viable manufacturer for any new inventory.  Filing No. 145 173:4–6.

Zhou admitted that "it's not enough to just have the intent or a plan to develop a new product, you have to have the ability to do it."  Filing No. 146 at 293:3–10.  Zhou acknowledged that "if DoubleTap did not have any product at all existing going forward, then they will not have any value."  *Id.* at 293:18-20.  She stated that "[i]f any business didn't have a product, didn't have plans to develop new product, there wouldn't be any future value based on an income approach because there will not be any future cash flow."  *Id.* at 293:20-24.  The evidence shows that DTD did not have any plans to continue to sell its first-generation pistol and had no viable plan at that point to develop a second-generation pistol.  Accordingly, the assumptions at the heart of DTD's damages calculation were flawed and there is no evidence that DTD had any future value on the date of the cease-and-desist letter.

For the reasons stated herein,

IT IS ORDERED that DTD's claims are deemed without merit, and the Court finds in favor of Hornady.  The Court will enter a judgment in accordance with these Findings of Fact and Conclusions of Law.

Dated this 30th day of March, 2022.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge
